WINDOM, Presiding Judge.
Taurus Jermaine Carroll appeals his two capital-murder convictions and sentences of death. Carroll was convicted of one count of murder made capital for intentionally taking the life of Michael Turner after having been convicted of another murder within the preceding 20 years, see § 13A-5-40(a)(13), Ala.Code 1975, and a second count of murder made capital for intentionally taking the life of Turner while Carroll was under a sentence of life imprisonment, see § 13A-5-40(a)(6), Ala. Code 1975. The jury unanimously recommended that Carroll be sentenced to death. The circuit court accepted the jury’s recommendations and sentenced Carroll to death.

Facts

In 1997, Carroll was convicted of capital murder and was sentenced to death for killing Betty Long during the course of a first-degree robbery. See § 13A-5-40(a)(2), Ala.Code 1975; Carroll v. State, 852 So.2d 801, 804 (Ala.Crim.App.1999). On appeal, the Alabama Supreme Court affirmed Carroll’s capital-murder conviction but reversed his sentence of death and remanded the cause with instructions that Carroll be resentenced to life in prison without the possibility of parole. Ex parte Carroll, 852 So.2d 833, 837 (Ala.2002).
On September 14, 2009, Carroll, who was serving his sentence of life without the possibility of parole at St. Clair Correctional Facility, mistakenly believed that Turner, another inmate at St. Clair Correctional Facility, had stolen his cellular telephone.[1] That evening, Carroll asked Turner if Turner had taken Carroll’s telephone. Turner stated that he did not take Carroll’s telephone. Carroll did not believe Turner and told Turner that Turner needed to go find something to fight with because Carroll would be back to fight. Carroll then followed Turner to Turner’s cell block, and the two separated.
Carroll returned twice, both times confronting Turner about the telephone. At some point, Carroll asked Turner whether Turner was going to return the telephone to Carroll. Turner stated that he did not have the telephone, and Carroll responded, “don’t worry about it, I don’t want it back. I’m fixing to Mil your bitch ass. You need to go get you some help or get you a knife.” (State’s exhibit # 30.) Later, Carroll again asked Turner for the telephone. *1145 Turner again denied having the telephone and walked past Carroll. When Turner walked past Carroll, Carroll stabbed him in the back with a knife fashioned out of part of an air-conditioner vent. Turner then ran from Carroll and tried to take cover in a prison cell by shutting the door. Carroll chased Turner and pushed his way into the prison cell. Once in the cell, Carroll stabbed Turner, who was unarmed, repeatedly in the head, neck, and body. While Carroll was stabbing Turner, Turner stated he did not have the telephone and begged Carroll not to kill him. At that point, Carroll stopped stabbing Turner and said: “Man, you could have did this before it came to this point, now you want to tell me somebody else [has] got it.” (State’s exhibit # 30.) At that point, Carroll started stabbing Turner again. During the attack, Carroll cut one of his own fingers.
After repeatedly stabbing Turner, Carroll walked away, threw the knife in a trash can, and went up stairs to the second tier of the prison. Once upstairs, Carroll took his shirt off and threw it on the ground. He then washed Turner’s blood off his hands and arms.
At the same time, Turner left the cell and fell to the ground at the bottom of the stairs separating the first and second tiers of the prison. Turner was bleeding and complaining that he could not breathe. He was placed on the prison ambulance—a modified golf cart—and taken to the prison infirmary. "While in the infirmary, Turner continued to complain that he could not breathe. Shortly after arriving at the infirmary, Turner died as a result of his wounds.
Meanwhile, prison guards went to the cell where Turner had been stabbed to investigate the disturbance. After washing his hand and arms, Carroll came back down the stairs and indicated to prison guards that it was he who had stabbed Turner. After Carroll received medical treatment for the cut on his finger, Carroll was placed in segregation where he admitted to correctional officer Brandon Carter that he had intended to kill Turner.
Early the next morning, Carroll was interviewed by two investigators, Robert G. Holtam and Milton Charles “M.C.” Smith, with the Investigation and Intelligence Division of the Alabama Department of Corrections (“I and I Division”). Carroll was read his Miranda rights, indicated that he understood those rights, and stated that he wished to waive them.[2] Carroll then gave a full confession, which was recorded.
During the investigation, officers recovered the knife from the trash can where Carroll said he disposed of it. Officers also seized the pants Carroll had been wearing during the attack. DNA testing indicated that blood recovered from the knife and Carroll’s pants belonged to Turner.
The autopsy performed by Dr. Emily Ward indicated that Turner sustained 16 stab wounds to his head, neck, and body. One stab wound to his head penetrated his skull. Turner was also stabbed in the neck, penetrating the muscle and severing the right jugular vein. Additionally, Turner’s right lung was punctured. According to Dr. Ward, Turner’s wounds would have been extremely painful, and he would have experienced the feeling of suffocating. Dr. Ward testified that Turner “would have been suffering a combination of fear and panic, not being able to breathe and also the pain associated with the injuries.” (R. 708.) Dr. Ward further testified that *1146 “Turner died as a result of multiple stab wounds and cuts.” (R. 708.)

Standard of Review

This Court has explained that:
“ ‘When evidence is presented ore tenus to the trial court,' the court’s findings of fact based on that evidence are presumed to be correct,’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); ‘[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,’ Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986); and we make ‘ “all the reasonable inferences and credibility choices supportive of the decision of the trial court.” ’ Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting Bradley, 494 So.2d at 761.”
State v. Hargett, 935 So.2d 1200, 1203 (Ala.Crim.App.2005). A circuit court’s “ruling on a question of law[, however,] carries no presumption of correctness, and this Court’s review is de novo.” Ex parte Graham, 702 So.2d 1215, 1221 (Ala.1997). Thus, “[w]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.” Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004).
Further, because Carroll has been sentenced to death, this Court must search the record for plain error. Rule 45A, Ala. R.App. P., states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
*1147 11 So.3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly-raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Although Carroll’s failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991).
I.
Carroll first argues that the circuit court erroneously found that he is not mentally retarded; therefore, he is eligible for a death sentence.' Carroll asserts that an intelligence quotient (“IQ”) test performed by Dr. Jerry Gragg indicated that Carroll has a full-scale IQ score of 71, which, according to Carroll, falls within what the Supreme Court of the United States considers the range of mental retardation. Carroll also argues that the circuit court erroneously failed to apply the “Flynn effect” to his IQ score, which would result in an even lower score. According to Carroll, the Eighth Amendment to the Constitution of the United States requires courts to apply the “Flynn effect.” Carroll also argues that the circuit court erred by failing to consider the standard error of measurement to decrease his IQ score. Carroll next argues that the circuit court should have considered evidence of his deficiencies in adaptive functioning to adjust his IQ score into the mental-retardation range. Carroll then argues that the circuit court erred in finding that he does not suffer from significant deficiencies in his adaptive functioning and that his low IQ and adaptive-functioning deficiencies manifested themselves during Carroll’s developmental years. This Court disagrees.
In Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court of the United States held that the execution of mentally retarded capital offenders violates the Eighth Amendment’s prohibition of cruel and unusual punishment. The Court, however, declined to establish a national standard for determining whether a capital -offender is mentally retarded and,' instead, left to the States “ ‘the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ ” Id. at 317 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)).
The Alabama Legislature has not yet established a method for determining whether a capital defendant is mentally retarded and, thus, ineligible for a sentence of death. “However, the Alabama Supreme Court, in Ex parte Perkins, 851 So.2d 453 (Ala.2002), adopted the most liberal definition of mental retardation as defined by those states that have legislation barring the execution of a mentally retarded individual.” Byrd v. State, 78 So.3d 445, 450 (Ala.Crim.App.2009) (citations and quotations omitted); see also Smith v. State, 213 So.3d 239, 248 (Ala.2007) (“Until the legislature defines mental retardation for purposes of applying Atkins, this Court is obligated to continue to operate under the criteria set forth in Ex parte Perkins.”). Under Ex parte Perkins, “to be considered mentally retarded, [a capital defendant] must have significantly subaverage intellectual functioning (an IQ -of 70 or below), and significant or substantial deficits in adaptive behavior.” 851 So.2d. at 456; see also Atkins, 536 U.S. at 321 n. 5; Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir.2009) (“According to literature in the field, significant or substantial deficits in adaptive behavior are defined as ‘concurrent deficits or impairments in present adaptive functioning in at least *1148 two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.’ American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed.1994).”). Further, “these [two deficits] must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).” Ex parte Perkins, 851 So.2d at 456; Brownlee v. Haley, 306 F.3d 1043, 1073 (11th Cir.2002) (recognizing that mental retardation generally requires a showing of an IQ of 70 or below, significant limitations in adaptive skills, and the manifestation of both deficits during the developmental years). “Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.” Smith v. State, 213 So.3d at 248; see also Byrd, 78 So.3d at 450 (same); cf. Ex parte Perkins, 851 So.2d at 456 (holding that Perkins was not mentally retarded because, among other reasons, Perkins’s full-score adult IQ was 76); Roper v. Simmons, 543 U.S. 551, 578-79, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (focusing on defendants’ culpability “when their crimes were committed”).
“ ‘In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.’” Byrd, 78 So.3d at 450 (quoting Smith, 213 So.3d at 252). “The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.” Byrd, 78 So.3d at 450 (citations and quotations omitted). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, “ ‘which [have] the opportunity to personally observe the witnesses and assess their credibility.’” Smith, 213 So.3d at 253 (quoting Smith v. State, 213 So.3d. 226, 239 (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).
“This court reviews the circuit court’s findings of fact for an abuse of discretion.” Byrd, 78 So.3d at 450 (citing Snowden v. State, 968 So.2d 1004, 1012 (Ala.Crim.App.2006)). “ ““ “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.” ”” ” Byrd, 78 So.3d at 450-51 (quoting Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005), quoting in turn State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996), quoting in turn Dowdy v. Gilbert Eng'g Co., 372 So.2d 11, 12 (Ala.1979), quoting in turn Premium Serv. Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir.1975)).
Applying these principles, this Court concludes that the circuit court did not abuse its discretion when it determined that Carroll is not mentally retarded and, thus, is eligible for a sentence of death. At the Atkins hearing, Susan Wardell, a lawyer, mitigation specialist, and clinical social worker, testified at length regarding Carroll’s background. She opined that Carroll has significant deficits in adaptive functioning and that those deficits manifested themselves before the age of 18.[3] *1149 In reaching her conclusion, Wardell reviewed files given to her by defense counsel, interviewed Carroll, and spoke with nine of his relatives. She stated that Carroll was in special-education classes and that he had trouble learning. She stated that Carroll twice failed the first grade and the eighth grade, which indicated to Wardell that he was mentally retarded. She stated that Carroll’s mother abused drugs and alcohol while she was pregnant with him, which is an indication of adaptive deficits. She testified that Carroll’s father was absent from his life, which is “one of the biggest risk factors” for adaptive deficits. (R. 57.) She further testified that Carroll’s mother was abusive and that Carroll had suffered some head injuries. Wardell testified that another risk factor was sexual abuse. According to Wardell, Carroll was sexually abused at age two. She testified that Carroll was again sexually abused at age seven and that he had contracted gonorrhea. According to War-dell, Carroll’s family members indicated that he was quiet and withdrawn and that he did poorly in school.
On cross-examination, Wardell stated that she is a member of the National Alliance of Sentencing Advocates and Mitigation Specialists, a group opposed to the death penalty. When asked whether Carroll’s motivation to avoid the death penalty may have played a factor in the answers he gave to Wardell, Wardell stated that she did not know. Wardell admitted that Alabama Department of Human Resources had determined that some of the allegations of abuse were unfounded. Regarding the sexual abuse at age seven, Wardell admitted that Carroll had actually contracted gonorrhea from a seven-year-old girl. Wardell was unaware of the jobs Carroll had held while in prison. She was also unaware of whether he was in special-education classes for all classes or just for reading. Wardell also testified that Carroll passed the General Educational Development (“GED”) exam while in prison.
Carroll next called Dr. Robert Shaffer, a clinical psychologist, with an independent practice in neuropsychology and forensic psychology. Dr. Shaffer interviewed Carroll, reviewed previous psychological reports, reviewed material from the Alabama Department of Corrections (“DOC”), and examined Carroll’s social history. Dr. Shaffer testified that he reviewed a court-ordered report prepared by Dr. Gragg. Dr. Gragg administered the Wechsler Adult Intelligence Scale, 4th Edition, to Carroll, which indicated that Carroll’s full-scale IQ score was 71. Dr. Shaffer testified that there is a standard error of measurement of plus or minus five points. Dr. Shaffer also testified that when the “Flynn effect” is applied to Dr. Gragg’s results, Carroll’s IQ is actually 69.5.
Dr. Shaffer administered the Halstead Reitan Neuropsychological Test battery to determine whether Carroll’s brain functioned normally, and Carroll scored in the impaired range. Dr. Shaffer stated that Carroll also scored in the impaired range on the Stroop Neuropsychological Screening test, the Boston Naming test, and the Animal Naming test, and the Key Auditory Verbal Learning test. Dr. Shaffer testified that he administered the test of memory malingering, which indicated that Carroll was not malingering. Dr. Shaffer also gave Carroll the Wechsler Individual Achievement test, a standard test of academic-learning proficiency, and Carroll scored in the lower range. Dr. Shaffer administered the Vineland test and the Adaptive Behavior Assessment System test for adaptive functioning, and Carroll did poorly in multiple areas. Dr. Shaffer *1150 then testified that it was his opinion that Carroll is mildly mentally retarded.
The State called as a witness Dr. Susan K. Ford, a psychologist and the director of Psychological and Behavioral Services for the Division of Developmental Disabilities with the Alabama Department of Mental Health. Dr. Ford administered the Adaptive Behavior Scale for Residential and Community Living-2 (“ABSRC”) to Carroll. According to Dr. Ford, the ABSRC is recognized in the field of psychology as an appropriate and reliable means to measure adaptive functioning. Dr. Ford testified that the ABSRC tests the following 10 domains: “independent functioning, physical development, language development, numbers and time, domestic activity, economic activity, prevo-cational and vocational activity, self-direction, responsibility, and. socialization.” (R. 151.) Regarding the scoring of the ABSRC, Dr. Ford explained that “[e]ach domain has a range, and it could be extremely low, below average, average, above average, superior, and very superi- or.” (R. 152.) Dr. Ford testified that Carroll’s scores in “[a]ll of the domains were at least in the above average range, and there were five domains that were in the superior range.” (R. 156.) Dr. Ford opined that Carroll’s adaptive functioning does not fall within the definition of mental retardation.
Dr. Ford also testified that Carroll informed her that he liked to read novels and self-help books. She testified that Carroll had passed his GED exam and that “most individuals with mental retardation would not be able to pass the GED.” (R. 171.) Carroll indicated to Dr. Ford that, in school, he was in a learning-disability class for reading but regular class for math. Dr. Ford stated that there was nothing in Carroll’s records to indicate that he was mentally retarded and that Dr. David Sandefer, who evaluated Carroll in 2004 for the DOC, found Carroll to be within the borderline range of intellectual functioning. Dr. Ford also testified that Carroll understood her questions and answered those questions without any difficulty. She also testified that the American Psychological Association does not recommend subtracting points from an IQ score and does not recommend applying the “Flynn effect.”
Officer Brian Griffith of the DOC testified that he had known Carroll for three or four years. Officer Griffith testified that he had supervised Carroll, who worked in the prison kitchen as a baker. According to Officer Griffith, Carroll was one on the better kitchen workers and was able to do his job effectively and consistently without any problems. Officer Griffith testified that he had no difficulty communicating with Carroll and that Carroll was able to follow directions and to complete his tasks.
M.C. Smith, with the I and I division, investigated Carroll’s involvement in Turner’s murder and interviewed Carroll. Smith testified that, during the interview, Carroll read his Miranda rights. He was coherent and able to respond to questions. According to Smith, Carroll had no problem understanding any of the questions posed to him. Smith also went into Carroll’s prison cell. In his cell, Carroll had eight or nine paperback books, including, but not limited to, Zen Lessons, The Holy Bible, Oxford History of the American People Volume 1, Oxford American Dictionary, The Meaning of the Holy Quran, and Jailhouse Lawyer’s Handbook. He also had the hardback book The Brotherhood. Carroll also had two Jet magazines, a Today magazine, and newspaper articles about his case.
Dr. Glen D. King, a clinical and forensic psychologist, evaluated Carroll prior to tri *1151 al. Dr. King reported the following regarding Carroll:
“[Carroll] had good cogitative skills. His memory was intact. He was able to immediately recall a color,'object, and number, and could recall these same three items with 100% accurately after 10 minutes. He had good remote memory. He was oriented to person, place, and time. He knew his birth date, social security number, and AIS number without referral to written information. He knew the place of the evaluation as well as the day of the week, the date, and the time of day accurately. He had good concentration with no distractibility. He was able to engage in abstract reasoning and he gave an abstract interpretation [of] a proverb. He knew the names accurately of the current and immediate past presidents of the United States. His judgment is adequate and his intellectual ability is average.”
(C. 81-82.) The record also contains two IQ scores from Carroll’s school records. In 1984, Carroll was given the Wechsler Intelligence Scale for Children—revised— and achieved a full-scale score of 85. In 1987, Carroll was retested with the Wechsler Intelligence Scale for Children—revised—achieved a full-scale score of 87 and was classified as having low-average intelligence.
Based on the foregoing, the circuit court found that Carroll was not mentally retarded. Specifically, the circuit court found that Carroll failed to meet his burden of proving that he “currently exhibit[s] subaverage intellectual functioning, currently exhibits] deficits in adaptive behavior, and [that] these problems ... manifested themselves before the age of 18.” Smith, 213 So.3d at 248. Based on the evidence presented at the Atkins hearing, this Court cannot say that the circuit court abused its discretion in finding that Carroll is not mentally retarded.
Regarding subaverage intellectual functioning, Dr. Gragg administered the Wechsler Adult Intelligence Scale, 4th Edition, to Carroll, and Carroll achieved a full-scale IQ score of 71. Carroll’s full-scale IQ score of 71 places him outside the Alabama Supreme Court’s definition of mentally retarded. Carroll argues, however, that the circuit court erred by failing to apply the “Flynn effect,” the standard error of measurement, and his adaptive functioning deficiencies to lower his score. This Court disagrees. First, the circuit court could have reasonably rejected the “Flynn effect” and determined that Carroll’s full-scale IQ was 71 or greater. See Albarran v. State, 96 So.3d 131, 200 (Ala.Crim.App. 2011) (holding that “the circuit court could have reasonably rejected the ‘Flynn effect’ ”) (citing Gray v. Epps, 616 F.3d 436, 446 n. 9 (5th Cir.2010), quoting In re Mathis, 483 F.3d 395, 398 n. 1 (5th Cir. 2007) (“[T]he Flynn Effect ‘has not been accepted in this Circuit as scientifically valid.’ ”)); Bowling v. Commonwealth, 163 S.W.3d 361, 375 (Ky.2005) (holding that “Atkins did not discuss margins of error or the ‘Flynn effect’ and held that the definition [of mental retardation] in KRS 532.130(2) ‘generally conformfed]’ to the approved clinical definitions” so the court could not consider the Flynn effect); Thomas v. Allen, 607 F.3d 749, 758 (11th Cir.2010) (“[T]here is no uniform consensus regarding the application of the Flynn effect in determining a capital offender’s intellectual functioning, and there is no Alabama precedent specifically discounting a court’s application of the Flynn effect. ...”). Dr. Ford testified that the American Psychological Association does not recommend subtracting points from an IQ score and does not recommend applying the “Flynn effect.” She also testified that the “Flynn effect” is not widely ac *1152 cepted or applied in Social Security cases or education cases. Accordingly, the circuit court reasonably concluded that the “Flynn effect” should not be applied to lower Carroll’s IQ score. .
Further, contrary to Carroll’s assertion, the circuit court did not erroneously refuse to consider the standard error of measurement to lower his score. In Byrd, 78 So.3d at 451-52, this Court rejected a similar argument as follows:
“During oral argument before this court, Byrd argued that although Dr. Ackerson’s testing showed that he had an IQ score of 72, she also testified that based on a ‘95 percent’ confidence interval, Byrd’s ‘true IQ [is] between 68 and 77.’ (R. 55.) Byrd then urged this court to presume that his true IQ falls at the low end of the confidence interval— between 68 and 70—and to find that he meets the first requirement under Ex parte Perkins.
“There are two fatal flaws in Byrd’s argument. First, Byrd bears the burden of establishing by a preponderance of the evidence that he meets the Alabama Supreme Court’s criteria for mental retardation. Smith v. State, 213 So.3d at 252. By relying on the mere possibility that his true IQ falls at the low end of the confidence interval or, as he described it, the ‘margin of error,’ Byrd has not met his burden to establish that it is more likely than not that his IQ is 70 or below. Second, based on Dr. Ackerson’s testimony that Byrd did not perform optimally on the test she administered (R. 65-66), it is possible that his true IQ is above rather than below 72. In any event, this court rejects Byrd’s request that we presume that-a capital defendant’s IQ falls at the bottom range of the confidence interval or ‘margin of error’ (Byrd’s Brief at 30-38), and we hold that Byrd did not establish that he currently exhibits subaverage intellectual functioning.”
Similarly, the circuit court did not err by refusing to presume that Carroll’s IQ falls in the lower end of the standard error of measurement. Carroll had the burden to establish that his IQ falls below 70, and he cannot rely on the mere possibility that his true IQ falls at that low end of the standard error of measure. Moreover, there is evidence in the record indicating that Carroll’s IQ was actually higher than 71. Specifically, Dr. King determined that Carroll had average intellectual ability. Additionally, Carroll passed the GED exam. Further, Carroll received full-scale IQ scores of 85 and 87 while in school. Based on the foregoing, this Court cannot say that the circuit court abused its discretion in finding that Carroll does not suffer from sub-average intellectual functioning.
Likewise, the circuit court did not abuse its discretion by finding that Carroll failed to prove that he currently exhibits deficits in adaptive behavior. Carroll successfully held a job in the prison kitchen and was considered one of the better employees. He read novels, self-help books, and magazines. He passed the GED exam. Carroll’s 'actions in the prison kitchen and during his crime were goal oriented. Each of these facts indicated to Dr. Ford that Carroll did not exhibit deficits in his adaptive functioning.
Further, Dr. Ford administered the ABSRC to Carroll to measure adaptive functioning. The ABSRC tests 10 domains, and Carroll scored above average to superior in all domains. Based on Carroll’s test results, Dr. Ford determined that Carroll does not exhibit deficits in adaptive functioning. Although Dr. Shaffer disagreed with Dr. Ford’s findings, his disagreement raises an issue of credibility. The Alabama Supreme Court has ex *1153 plained: “When evidence is presented ore tenus, it is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanors, and not the appellate court, to make credibility determinations and to weigh the evidence presented.” Ex parte Hayes, 70 So.3d 1211, 1215 (Ala.2011) (citing Blackman v. Gray Rider Truck Lines, Inc., 716 So.2d 698, 700 (Ala.Civ.App.1998)). Thus, it is not this Court’s role to second-guess the circuit court’s credibility determination relating to the opinions of two competing psychologists. Based on Dr. Ford’s testimony, the circuit court did not abuse its discretion in finding that Carroll failed to prove that he currently exhibits deficits in his adaptive functioning.
Finally, the circuit court correctly determined that Carroll failed to prove that he suffered from subaverage intellectual functioning and deficits in his adaptive behavior before the age of 18. As discussed above, Carroll’s school records indicate that his IQ was tested in 1984 and 1987 and that he achieved full-scale scores of 85 and 87, respectively. Further, Carroll’s school records indicate that he was classified as having low-average intelligence. Based on Carroll’s school records, the circuit court did not abuse its discretion by finding that Carroll failed to prove that he suffered from subaverage intelligence before the age of 18.
The Alabama Supreme Court has explained that “[t]he role of the appellate court is not to reweigh the evidence but to affirm the judgment of the trial court if its findings are reasonably supported by the evidence and the correct legal conclusions have been drawn therefrom.” Ex parte Hayes, 70 So.3d at 1215 (citations omitted). The circuit court’s finding that Carroll is not mentally retarded is supported by evidence in the record; therefore, this Court cannot say that that court abused its discretion. Consequently, this issue does not entitle Carroll to any relief.
II.
Carroll argues that the circuit court erroneously granted the State’s motion to strike prospective juror no. 155, L.P., for cause. Specifically, Carroll argues that L.P. did not unequivocally state that she could not follow the circuit court’s instructions and recommend a sentence of death; therefore, the circuit court erroneously granted the State’s motion to strike L.P. for cause. This Court disagrees.
During voir dire, the prosecutor asked whether there was anyone who could not follow the circuit court’s instructions to weigh the mitigating circumstances and the aggravating circumstances and, if the facts warrant, recommend a sentence of death. L.P. responded: “I would have to say I don’t know that I could.” (R. 376.) Thereafter, the following occurred:
“[State]: Okay. At that point, you said you don’t know if you could or not?
“[L.P.]: Yes.
“[State]: Let me ask you this. Are you against the death penalty?
“[L.P.]: I really don’t know.
“[State]: Okay. So I think you put you weren’t opposed to it nor in favor of it?
“[L.P.]: Right.
“[State]: Okay. Well, what you’re saying is, if you are actually one of the ones that were selected to serve on this jury, and it got to the penalty phase part, you’re just not sure if you could give both the State and the Defendant a fair shot at weighing those circumstances and coming up with the result?
“[L.P.]: I guess.”
(R. 377.) The State moved to strike L.P. for cause on the ground that she could not *1154 follow the circuit court’s instructions and impose a sentence of death if appropriate under the facts. Defense counsel argued that L.P.’s responses were not unequivocal; rather, L.P. stated that she did not know whether she could follow the circuit court’s instructions. Thus, defense counsel argued, L.P. should not be struck for cause. The circuit court, then, brought L.P. back for further questioning. During that questioning, the following occurred:
“THE COURT: If the jury were to find beyond a reasonable doubt that the Defendant committed capital murder, then it would go to the guilt—from the guilt phase to the penalty phase, and you understand that. It would be the second phase of the trial.... If you, as a juror, found that the aggravating ... circumstances were proven beyond a reasonable doubt and that they outweigh the mitigating circumstances, could you find, in accordance with law, death in that' case? That’s the question.
“[L.P.]: I guess, since I really can’t make a decision now, that I would probably lean more towards the no.
“[Defense]: ... Let me ask you this: If you heard the evidence and you were on the jury that found the Defendant guilty, could you listen to the Judge’s instructions about the mitigating and the aggravating circumstances, because you would have a choice to determine that the mitigating outweigh the aggravating and the aggravating outweigh the mitigating, could you be fair and impartial in making that decision? Irregardless of what the other 11 people on the jury did, you would have your own decision to make. Could you—basically; could you follow the Judge’s instructions as it relates to your conscience about the matter?
“[L.P.]: Yes, I could follow instructions and everything. I just don’t know that I could impose the death penalty on somebody when it came right down to it.
“THE COURT:' Okay. Well, let me follow up. Maybe this might help you. If my instructions were that, if you found ... the aggravating circumstances beyond a reasonable doubt to outweigh the mitigating circumstances, and those were my instructions, could you follow those instructions and find death in that case?
“[L.P.]: And I understand completely, what you are saying.
“THE COURT: I just want to make sure for the record.
“[L.P.]: I just don’t know whether I could do that.”
(R. 396-98.) Thereafter, the circuit court granted the State’s motion to strike L.P. for cause.
It is well settled that:
“ ‘A trial judge’s finding on whether or not a particular juror is biased “is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.” [Wainwright v.] Witt, 469 U.S. [412] 429, 105 S.Ct. [844] 855 [ (1985) ]. That finding must be accorded proper deference on appeal. Id. “A trial court’s rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.” Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).’ ”
Boyle v. State, 154 So.3d 171, 196 (Ala. Crim.App.2013) (quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988)).
*1155 “ ‘ “In a capital case, a prospective juror may not be excluded for cause unless the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.” Drew v. Collins, 964 F.2d 411, 416 (6th Cir.1992), cert. denied, 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993) (quotations omitted). “[T]his standard likewise does not require that a juror’s bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.” [Wainwright v.] Witt, 469 U.S. [412] at 425-26, 105 S.Ct. [844] at 852-53 [ (1985) ].’ ”
Boyle, 154 So.3d at 196-97 (quoting Parr v. Thaler, 481 Fed.App’x 872, 876 (5th Cir.2012) (not selected for publication in the Federal Reporter)).
This Court addressed a similar issue in Boyle, 154 So.3d at 196-97. There, a prospective juror stated that she was opposed to the death penalty but could consider it. Id. at 195. Upon further questioning, the prospective juror stated that she did not know whether she could fairly consider the death penalty. Id. The State moved to strike the juror for cause, and the circuit court granted that motion. On appeal, Boyle argued that the circuit court erroneously granted the State’s motion because the prospective juror was qualified. This Court disagreed. Specifically, this Court held that the prospective juror’s answers “clearly showed that [she] had reservations about her ability to vote for the death penalty[; therefore,] the circuit court did not abuse its considerable discretion in granting the State’s motion to excuse [her] for cause.” Id. at 197.
Similarly, L.P. stated that she did not know if she could follow the circuit court’s instructions and fairly consider a sentence of death. She then explained that she “lean[ed] more towards” not being able to follow the court’s instructions. (R. 397.) L.P.’s answers “clearly showed that [she] had reservations about her ability to vote for the death penalty[; therefore,] [t]he circuit court did not abuse its considerable discretion in granting the State’s motion to excuse [her] for cause.” Boyle, 154 So.3d at 197. Therefore, this issue does not entitle Carroll any relief.
III.
Carroll next argues that African-Americans, a distinctive group, were systematically excluded from his jury venire in violation of the 5th, 6th, 8th, and 14th Amendments to the United States Constitution and Alabama law. (Carroll’s brief, at 54.) To support his argument, Carroll asserts that “the 2010 census of St. Clair County showed that African-Americans constituted 8.6% of the population (C. 145, R. 241)[;] [h]owever, of the 202 persons comprising the jury venire summoned in the 30th Judicial Circuit for service on September 14, 2012, defense counsel noted that only 7 [or 3%] were African-American. (R. 241.)” (Carroll’s brief, at 51.) Thus, Carroll asserts, African-Americans were underrepresented in his jury venire. Carroll’s entire argument is based on the list of the people summoned to jury duty. (R. 242.) In addition to his argument relating to the percentages of individuals summoned for jury duty, Carroll asserts that the circuit court erroneously thwarted his effort to establish systematic exclusion of African-Americans from St. Clair veni-res because it failed to rule on his motion to “order the Administrative Office of Courts (‘AOC’) to provide information regarding the jury selection process for St. Clair County, as well as information related to the composition of all juries empaneled in the years preceding Mr. Carroll’s trial.” (Carroll’s brief, at 52.) This Court *1156 notes that, because the circuit court did not rule on Carroll’s motion, these issues are reviewed for plain error only. Rule 45A, Ala. R.App. P.; Travis v. State, 776 So.2d 819, 842 (Ala.Crim.App.1997).
In Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court of the United States explained:
“In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a ‘distinctive’ group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepre-sentation is due to systematic exclusion of the group in the jury-selection process.”
The Duren Court defined “systematic exclusion” as exclusion that is “inherent in the particular jury-selection process utilized.” Id. at 366; see also Gibson v. Zant, 705 F.2d 1543, 1549 (11th Cir.1983) (“[T]he Duren Court ... defined ‘systematic’ as ‘inherent in the particular jury-selection process utilized.’ ”). “[T]he fair cross-section requirement ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire.” Gavin v. State, 891 So.2d 907, 945 (Ala.Crim.App.2003) (internal citations and quotations omitted). “Rather than being entitled to a cross-sectional venire, a defendant has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel.” Id. (internal citations and quotations omitted). This Court has repeatedly held that the random drawing of veniremembers from a list of licensed drivers satisfies the fair-cross-section requirement. See id. at 946-47; Carroll v. State, 852 So.2d 801, 807-08 (Ala.Crim.App.1999); Clemons v. State, 720 So.2d 961, 972 (Ala.Crim.App.1996); Sistrunk v. State, 630 So.2d 147, 149-50 (Ala.Crim.App.1993).
It is undisputed that the first Duren factor has been met. Cf. Gavin v. State, 891 So.2d 907, 946 (Ala.Crim.App.2003) (“African-Americans are a distinctive group in the community.”). Carroll, however, has not established the second Duren factor—that the “representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community.... ” Duren, 439 U.S. at 364. In support of this factor, Carroll argues that African-Americans constituted 8.6% of the population in St. Clair County, and that, although 202 people were summoned for jury duty, only 7 of these were African-American; thus, African-Americans constituted only 3% of Carroll’s venire. The record, however, established that 300 people were summoned for jury duty on September 14, 2012, and, of those people, 26 were African-American. (Supp. C. 12-32.) Thus, African-Americans composed 8.67% of the individuals summoned for jury duty. Because African-Americans compose 8.6% of the population in St. Clair County (C. 145), and they composed 8.67% of the individuals summoned to potentially serve on Carroll’s jury, Carroll cannot establish that the representation of African-Americans on his venire was “[unjfair and [unreasonable in relation to the number of such persons in the community.” Duren, 439 U.S. at 364.
Further, because Carroll cannot establish the second Duren factor, any error by the circuit court in failing to rule on Carroll’s discovery motion to help him prove the third Duren factor was harmless and did not rise to the level of plain error. *1157 Rule 45A, Ala. R.App. P. Stated differently, any error in failing to grant discovery relating to the third element of his fair-cross-section claim was harmless because, even with discovery, the second element is refuted by the record and his claim would nevertheless fail. Cf. Bryant v. State, 181 So.3d 1087, 1141 (Ala.Crim.App.2014) (holding that any error in the circuit court’s refusal to grant discovery to allow a Rule 32 petition to prove prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was harmless because counsel’s performance was not deficient and the claim would nevertheless fail). Consequently, this issue does not entitle Carroll to any relief.
IV.
Carroll next argues that, under the holdings in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), his Eighth Amendment right to be free from cruel and unusual punishment was violated by the use of his prior capital-murder conviction as an element of his current capital-murder convictions and as aggravating factors considered when sentencing him to death. This Court disagrees.
As stated above, Carroll was convicted of 2 counts of capital murder for killing Turner after having been convicted of another murder within the preceding 20 years, see § 13A-5-40(a)(13), Ala.Code 1975, and while he was under a sentence of life imprisonment, see § 13A-5-40(a)(6), Ala.Code 1975. Further, the circuit court found that the following aggravating circumstances supported the imposition of a sentence of death: 1) “the capital offense was committed by a person under sentence of imprisonment,” § 13A-5-49(1), Ala. Code 1975; and 2) “[t]he defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person,” § 13A-5-49(2), Ala.Code 1975. Carroll was under the age of 18 when he committed the capital offense that resulted in the conviction and sentence used to support his current capital-murder convictions and sentences of death. According to Carroll, the use of a conviction and sentence resulting from actions taken when he was a juvenile to support his current capital-murder convictions and sentences violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the Constitution of the United States under Roper v. Simmons, 543 U.S. 551, 569-70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and Graham v. Florida, 560 U.S. 48, 81-82, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). His argument, however, has been soundly rejected by this Court.
In Woodward v. State, 123 So.3d 989, 1048 (Ala.Crim.App.2011), this Court addressed the argument that a conviction for actions committed when the defendant was a juvenile could not be used as an aggravating circumstance for a subsequent capital offense. This Court explained:
“The State presented evidence at the penalty phase of Woodward’s trial to establish that Woodward had a prior conviction for manslaughter, and Woodward acknowledged to the jury that he had been convicted of manslaughter and that that conviction could be used as an aggravating circumstance. (R. 1368.) The jury found that aggravating circumstance to exist, as did the trial judge in his sentencing order. Although Woodward was a juvenile when he committed the crime, he was tried as an adult and was convicted and sentenced to 15 years’ imprisonment. (C. 918.) Therefore, the conviction was properly considered by the trial court as an aggravating circum *1158 stance. Yancey v. State, 65 So.3d 452, 477-78 (Ala.Crim.App.2009). The opinion in Yancey was rendered years after the decision in Roper; the reasoning in Roper did not then, and it does not now, prohibit the consideration, as an aggravating circumstance, of a prior adult conviction for a crime of violence, even if the crime was committed when the offender was under the age of 18. We agree with the reasoning expressed in United States v. Wilks, 464 F.3d 1240 (11th Cir.2006), in which the United States Court of Appeals for the Eleventh Circuit held that the reasoning in Roper did not prohibit using a youthful-offender conviction to enhance the sentence of an adult offender. The Court stated:
“‘Roper held only that the Eighth Amendment prohibits sentencing capital offenders to death if the offender was under the age of eighteen at the time of the offense.
“‘Our conclusion that youthful offender convictions can qualify as predicate offenses for sentence enhancement purposes remains valid because Roper does not deal specifically—or even tangentially—with sentence enhancement. It is one thing to prohibit capital punishment for those under the age of eighteen, but an entirely different thing to prohibit consideration of prior youthful offenses when sentencing criminals who continue their illegal activity into adulthood. Roper does not mandate that we wipe clean the records of every criminal on his or her eighteenth birthday.’
“United States v. Wilks, 464 F.3d at 1243.”
Woodward v. State, 123 So.3d 989, 1048 (Ala.Crim.App.2011). See also Taylor v. Thaler, 397 Fed.App’x 104, 107-08 (5th Cir.2010) (not selected for publication in the Federal Reporter) (holding that the Supreme Court’s holding in Roper does not prohibit using an offense committed when the defendant was a juvenile as an element of a capital offense committed when the defendant was an adult).
Although the offense used as an aggravating circumstance was committed when Carroll was under the age of 18, he was tried as an adult and was convicted of capital murder. The Eighth Amendment does not prohibit the State from using that prior conviction as elements of Carroll’s current capital offenses or as aggravating circumstances supporting Carroll’s sentences of death. See Woodward, 123 So.3d at 1048; Taylor, 397 Fed.App’x at 107-08. Therefore, this issue is without merit and does not entitle Carroll to any relief.
V.
Carroll next argues that the circuit court erroneously failed to suppress the statement he gave confessing to Turner’s murder. Carroll first argues that the circuit court erred by failing to hold a hearing on his motion to suppress his statement. He next argues that his statement should have been suppressed under Missouri v. Seibert, 542 U.S, 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), because prison officials used a “two-step” or “question first and warn later” tactic—a tactic in which police first obtain a statement without providing the suspect the warnings established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then subsequently obtain a properly Mirandized statement. Finally, Carroll argues that, due to his low intellect, he did not knowingly, intelligently, and voluntarily waive his Miranda rights. Carroll did not move for a hearing on his motion to suppress or object when his statement was admitted; therefore, these issues will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
*1159 A.[4]
Carroll argues that the circuit court erroneously allowed the State to introduce into evidence the statement he gave Investigator Holtam and Investigator Smith of the I and I division of the DOC. Specifically, Carroll argues that due to his mental deficiencies (i.e., his alleged mental retardation and/or his low IQ), he was incapable of knowingly waiving his Miranda rights. Although Carroll filed a pretrial motion to suppress his statement, the circuit court did not rule on his motion, and Carroll did not object to the admission of his statement at trial. Therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
“It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.” Waldrop v. State, 859 So.2d 1138, 1155 (Ala.Crim.App.2000) (citing Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990)). “The trial court’s finding that a statement was voluntary need only be supported by. a preponderance of the evidence.” Ex parte Jackson, 836 So.2d 979, 982 (Ala.2002) (citing Dixon v. State, 588 So.2d 903 (Ala. 1991)). “ Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused—i.e., the totality of the circumstances.’ ” Waldrop, 859 So.2d at 1156 (quoting Click v. State, 695 So.2d 209 (Ala. Crim.App.1996)); see also Ex parte Matthews, 601 So.2d 52, 54 (Ala.1992) (holding that a court must analyze the voluntariness of a confession by examining the totality of the circumstances).
A defendant’s low IQ is only one factor that must be considered as part of the totality of the circumstances. See Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994); Beckworth v. State, 946 So.2d 490, 517 (Ala.Crim.App.2005). “While an accused’s intelligence and literacy are important factors, ... weak intellect or illiteracy alone will not render a confession inadmissible.” Hobbs v. State, 401 So.2d 276, 282 (Ala.Crim.App.1981); see also Hodges v. State, 926 So.2d 1060, 1073 (Ala.Crim.App.2005) (same); cf. Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that mental defects alone are insufficient to establish that a confession was involuntary under the Due Process Clause). As this court stated in Beclmorth: “[A] defendant’s low IQ do¿s not preclude a finding that a Miranda waiver was voluntary unless the defendant is so mentally impaired that he did not understand his Miranda rights.” 946 So.2d at 517 (citing Dobyne, 672 So.2d at 1337); see Moore v. Dugger, 856 F.2d 129, 132 (11th Cir.1988) (mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness, and the fact that the defendant was generally calm and responsive during interrogation, that he did not appear confused, and that he understood the questions put to him established a valid waiver of Miranda rights, despite the defendant’s low IQ).
This Court’s review of the record and of Carroll’s statement convinces it that Carroll did, in fact, understand his rights and that he knowingly waived them. As discussed above, the circuit court, in a well reasoned order, found that Carroll was hot mentally retarded. Carroll could read and write and had obtained his GED while in *1160 prison. The circuit court correctly found that Carroll did not suffer from subaver-age intellectual capacity or deficits in adaptive functioning. Further, Carroll read novels and self-help books and had numerous books, magazines, and news articles in his cell.
Investigator Holtam testified that he and Investigator Smith interrogated Carroll after the murder. Before interrogating Carroll, Investigator Holtam read Carroll his Miranda rights. Investigator Smith had Carroll read a portion of a rights-waiver form to ensure that Carroll could read. Investigator Holtam testified that Carroll did not appear to be under the influence of drugs or alcohol and that he appeared to understand his rights. Investigator Holtam stated hat Carroll told them that he did not want an attorney and hat he was waiving his rights. According to Investigator Holtam, Carroll was not promised anything or coerced or threatened in any manner. Carroll also signed a rights-waiver form containing the following acknowledgment:
“I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand what I am doing. No promises or threats have been made to me and no pressures or coercion of any kind has been used against me.”
(C. 231.) Investigator Holtam testified that Carroll appeared to voluntarily waive his rights.
Investigator Holtam’s testimony is corroborated by Carroll’s recorded statement and a waiver-of-rights form signed by Carroll. Before any questioning, Carroll, who had obtained his GED while in prison, stated that he had read his Miranda lights from the waiver-of-rights form and signed the form indicating that he wished to waive his right. Then, Investigator Holtam reread Carroll his Miranda rights. Carroll stated that he understood his rights and that he wanted to waive them. During the interview, Carroll was calm, responsive, and did not appear confused. His answers to the questions establish that he understood those questions.
Additionally, Carroll has had extensive experience with the criminal-justice system, including having previously been convicted of capital murder for killing Betty Long during a robbery. Carroll v. State, 852 So.2d 801, 809 (Ala.Crim.App.1999). Before that trial, Carroll gave inculpatory statements that were used against him during the trial. Id. During the trial and on appeal, Carroll challenged the constitutionality of those statements. Id. Thus, Carroll was well aware of the consequences of giving a statement to law enforcement.
Based on the foregoing, this Court is convinced that Carroll knowingly and voluntarily waived his Miranda rights and that his mental deficiencies did not invalidate that waiver. Consequently, no error, much less plain error, resulted from the admission of Carroll’s statement. Therefore, this issue does not entitle Carroll to any relief.
B.
Carroll argues that his statement should have been suppressed under Missouri v. Seibert, 542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), because prison officials used a “two-step” or “question first and warn later” tactic—a tactic in which police first obtain a statement without providing the suspect with the warnings established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then subsequently obtain a properly Mirandized statement. Specifically, he argues that, “[s]hortly after the incident, Mr. Carroll was first interro *1161 gated by Warden Wise 'without the benefit of Miranda warnings.” (Carroll’s brief, at 62.) He was later interrogated a second time during which he was informed of his Miranda rights and waived those rights. According to Carroll, the use of this two-step process violated the holding in Sei-bert.
In White v. State, 179 So.3d 170 (Ala. Crim.App.2013), this Court explained:
“Regarding a properly warned confession given after an unwarned statement, courts look to two decisions of the Supreme Court of the United States: Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and Seibert, 542 U.S. 600, 124 S.Ct. 2601. The United States Court of Appeals for the Eleventh Circuit has explained the interplay between those two decisions as follows:
“ ‘In determining whether a properly warned confession is admissible where the defendant has first given an unwarned or improperly warned confession, we turn to the Supreme Court’s decisions in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Elstad sets out the general rule that the existence of a pre-warning statement does not require suppression of a post-warning statement that was knowingly and voluntarily made, 470 U.S. at 309, 105 S.Ct. at 1293, while Seibert sets out an exception for situations where police employ a deliberate “question first” strategy. 542 U.S. at 617, 124 S.Ct. at 2613.
“ ‘In Elstad, the defendant confessed after being subjected to unwarned custodial questioning at his house. 470 U.S. at 300-01, 315, 105 S.Ct. at 1288-89, 1296. The officers then took the defendant to their headquarters and an hour later gave him Miranda [v. Arizona, 384 U.S. 436 (1966),] warnings for the first time. [Elstad, 470 U.S.] at 301, 105 S.Ct. at 1289. He waived his rights and made a full confession, both orally and in a signed statement. Id. The Supreme Court rejected the defendant’s contention that the second confession should have been suppressed as “fruit of the poisonous tree,” the poison being the failure to advise him of his rights before he confessed the first time. Id. at 302, 309, 105 S.Ct. at 1289, 1293. The Court explained that it would be an “unwarranted extension of Miranda ” to suppress not only unwarned statements but also later statements that were knowingly and voluntarily made after proper warnings were finally given. Id.
“‘The rule of Elstad is that “the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.” Id. In making this determination courts are not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper Miranda warnings removes the effect of any conditions requiring suppression of the unwarned statement. Id. at 314, 105 S.Ct. at 1296. Where both confessions are voluntary, there is no justification for suppressing the “highly probative evidence of a voluntary confession.” Id. at 312, 105 S.Ct. at 1294-95; see also id. at 318, 105 S.Ct. at 1298 (“The relevant inquiry is whether, in fact, the second statement was also voluntarily made.”).
*1162 “‘The Elstad general rule applies both to instances, like this one, where the initial statements are inadmissible because of defective warnings and to those where no warnings were given at all before the first statements.” See Bryant v. Vose, 785 F.2d 364, 366-67 (1st Cir.1986); Watson v. DeTella, 122 F.3d 450, 453-55 (7th Cir. 1997),...
“ ‘The Elstad general rule is subject to the Seibert exception, which is aimed at putting a stop to the deliberate use of a particular police tactic employed for the specific purpose of undermining the Miranda rule. 542 U.S. at 618, 124 S.Ct. at 2614 (Kennedy, J,, concurring). The tactic in question is one where the police are instructed, as a matter of policy, to purposefully withhold Miranda warnings while interrogating a suspect in custody in order to obtain a full confession first and then provide him with full warnings and get him to re-confess. Id. at 605-06, 124 S.Ct. 2601. The process is known as the “two-step” or “question first” tactic, and it did not find favor in the Supreme Court.
“ ‘Because Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law. United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 n. 6 (11th Cir. 2006); see also Romano v. Oklahoma, 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994); Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). As Justice Kennedy explained, suppression of a post-warning confession is required if “the two-step interrogation technique [is] used in a calculated way to undermine the Miranda warning.” Seibert, 542 U.S. at 622, 124 S.Ct. at 2616. That means that if an officer employs a strategy of deliberately questioning an in-custody suspect without any Miranda warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the Miranda decision intended. Id. at 621, 124 S.Ct. at 2615-16. The curative measures required are a “substantial break in time and circumstance between the prewarning statement and the Miranda warning” or “an additional warning that explains the likely inadmissibility of the prewaming custodial statement.” Id. at 622, 124 S.Ct. at 2616. Curative measures are necessary only where the [deliberate] “question first” tactic has been used. Otherwise, the Elstad general rule that post-warning statements are admissible, even where they follow pre-warning statements that are not, governs.’ ”
179 So.3d at 190-92 (quoting United States v. Street, 472 F.3d 1298, 1312-14 (11th Cir.2006)).
Before trial, Carroll filed a motion to suppress his statement, arguing, among other things, that his statement should have been suppressed under Seibert because Warden David Wise interrogated him without providing him the warnings established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then subsequently the I and I division of the DOC obtained a properly Mirandized statement. The circuit court, however, did not rule on Carroll’s motion, and Carroll did not object when his state- *1163 merit was admitted at trial. Accordingly, this issue is reviewed for plain error only. Rule 45A, Ala. R.App. P.
This Court has repeatedly explained that it “will not find plain error based on a silent record.” Kelley v. State, [Ms. CR-10-0642, Sept. 5, 2014] — So.3d -, - (Ala.Crim.App.2014). Rather, to rise to the level of plain error, the “error must be obvious on the face of the record.” Ex parte Walker, 972 So.2d 737, 752 (Ala.2007). See also Woodward, 123 So.3d at 1006 (holding that the alleged error was “not obvious from the face of the record, and ... cannot, therefore, rise to the level of plain error”). The record before this Court does not contain any indication that Carroll was interrogated by Warden Wise or that Warden Wise sought to undermine the Miranda warnings.
Because there is no indication that Carroll was interrogated by Warden Wise or that the State used a “two-step” or “question first and warn later” tactic to obtain Carroll’s confession, this issue does not rise to the level of plain error. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Carroll to any relief.
C.
Carroll next argues that the circuit court erroneously failed to hold a hearing on his motion to suppress. Carroll did not request a hearing or object to the circuit court’s failure to hold one; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
It is well settled that a circuit court may not summarily deny a defendant’s motion to suppress a statement given to law enforcement and that the defendant is entitled to a hearing on that motion outside the presence of the jury. See Rule 104(c), Ala. R. Evid. (“In criminal cases, hearings on the admissibility of confessions or evidence alleged to have been obtained unlawfully shall be conducted out of the hearing and presence of the jury.”); Ex parte Jackson, 836 So.2d 973 (Ala.2001); Lewis v. State, 27 So.3d 600 (Ala.Crim.App.2008). However, the failure to hold a hearing in this case did not rise to the level of plain error. Rule 45A, Ala. R.App. P.; United States v. Wilson, 962 F.2d 621, 626 (7th Cir.1992) (holding that no plain error resulted from the district court’s failure to hold a hearing or to rule on the defendant’s motion to suppress); Lane v. State, 169 So.3d 1076, 1109 (Ala.Crim.App.2013) (holding that plain error did not result from the circuit court’s failure to hold a suppression hearing when, among other things, “defense counsel never raised the issue of suppression at any time during the trial, nor did he object when the recording of Lane’s confession was entered into evidence”).
Here, before the State sought to admit Carroll’s statement into evidence, it had established that Carroll was read his Miranda rights and that he had knowingly and voluntarily waived those rights. When the State sought to admit the recording of Carroll’s interrogation, the circuit court stated: “It is admitted with no objection.” (R. 630.) As the United States Court of Appeals for the Seventh Circuit has stated:
“If a motion is not acted upon a litigant had better renew it. He may not lull the judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of a forgotten motion.”
Wilson, 962 F.2d at 625. Having heard the evidence establishing that Carroll’s statement was admissible, defense counsel did not remind the circuit court of his motion to suppress, request a hearing, or object to the admission of his statement. Defense counsel’s failure to object indicates that counsel believed the statement *1164 to be admissible and no hearing was necessary.
Under these circumstances, this Court cannot say that the circuit court’s failure to hold a hearing on Carroll’s motion to suppress constituted plain error. Rule 45A, Ala. R.App. P. Therefore, this issue does not entitle Carroll to any relief.
D.
Moreover, even if the circuit court erroneously allowed the State to admit the recording of Carroll’s interrogation, any error was harmless beyond a reasonable doubt. See Rule 45, Ala. R.App. P.; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (holding that “before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt”).
In Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1993), the Alabama Supreme Court held that an error may be harmless if “evidence of guilt is ‘virtually ironclad.’ ” (citations and quotation marks omitted). “ ‘When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.’” Wiggins v. State, 193 So.3d 765, 785 (Ala.Crim.App.2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Thus, the erroneous admission of a confession will be harmless if, excluding the confession, the remainder of the “evidence of guilt is ‘virtually ironclad.’” Ex parte Greathouse, 624 So.2d at 211. See also Albarran, 96 So.3d at 154; Richardson v. State, 819 So.2d 91, 103 (Ala.Crim.App.2001).
The State’s evidence, excluding Carroll’s recorded confession, overwhelmingly established his guilt. The State presented evidence establishing that, shortly after attacking Turner, Carroll spontaneously admitted his guilt. DNA testing established that the pants Carroll was wearing had Turner’s blood on them. Carroll was taken to the infirmary for a cut on his hand that he had inflicted while he was attacking Turner. After his cut was treated, Carroll was placed in solitary confinement where he again spontaneously admitted to killing Turner.
Based on the foregoing, after excluding Carroll’s recorded statement, the State’s “evidence of [his] guilt [was] ‘virtually ironclad’ therefore, any error in the admission of Carroll’s recorded confession was harmless beyond a reasonable doubt. Ex parte Greathouse, 624 So.2d at 211. Consequently, this issue does not entitle Carroll to any relief.
VI.
Carroll next argues that his due-process right to present a defense was violated when the circuit court refused to allow him to present evidence attacking an element of the offense. Specifically, he argues that his right to present a defense was violated when the circuit court excluded testimony from Dr. Shaffer regarding “how Mr. Carroll’s prolonged incarceration from an early age [coupled with abuse suffered as a child and mental issues] affected his perception of events and therefore, its effect on the mens rea element of the offenses charged.” (Carroll’s brief, at 68-69.) Carroll asserts that testimony relating to his “institutionalization” “would tend to show that he responded to a perceived threat in the heat of passion ... [and] would be relevant to a charge on the less *1165 er-included-offense of manslaughter.” (Carroll’s brief, at 71.) According to Carroll, the circuit court’s refusal to allow him to present evidence of his “institutionalization” prevented him from attacking the intent element of capital murder; therefore, his convictions and sentences must be reversed. (Carroll’s brief, at 70.) This Court disagrees.
At trial, defense counsel argued that Dr. Shaffer’s testimony regarding “institutionalization” would have been relevant to a heat-of-passion defense. Specifically, defense counsel stated:
“We propose to call Dr. Robert Shaffer in the defense case in chief to speak to [Carroll’s] state of mind at the time of the offense. We anticipate Dr. Shaffer being able to testify that, due to [Carroll’s] incarceration since the age of 16, Dr. Shaffer will be able to testify that he is institutionalized, for lack of a better word, and that the taking of his phone because of his institutionalization, the taking of his phone would ... lead him more likely than not to respond physically to that event, that he would perceive that as a threat and respond in accordance to what a prison environment would warrant and give some rationale.”
(R. 712.) After the State objected, defense counsel explained that Dr. Shaffer’s testimony would be admitted, “simply to help that jury understand what Taurus was thinking, and why he reacted that way in the environment that he was in, [it was relevant to] [h]is state of mind.” (R 713-14.) Regarding Dr. Shaffer’s testimony, defense counsel stated:
“It will offer a reason for his actions. It will offer evidence that the reason he responded in the way that he did is because he felt threatened by the taking of his phone in that environment. Because in that environment, if he had not reacted the way he did, then he would have immediately become a victim. And he perceived that as a threat.”
(R. 715-16.) Thus, Carroll’s belief that Turner stole his telephone caused Carroll to believe that, if he did not kill Turner, Carroll would subsequently be victimized.
Initially, this Court notes that “institutionalization” is not relevant to reduce a criminal act from capital murder to heat-of-passion manslaughter. Section 13A-6-3, Ala.Code 1975, states, in pertinent part:
“(a) A person commits the crime of manslaughter if:
[[Image here]]
“(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.”
This Court has stated:
“Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.”
Spencer v. State, 58 So.3d 215, 245 (Ala.Crim.App.2008) (citations and quotations omitted). In Alabama, “[t]o constitute adequate legal provocation, [the provocation] must be of a nature calculated to influence the passions of the ordinary, reasonable man.” Id. (citations and quotations omitted). See also Biggs v. State, 441 So.2d 989, 992 (Ala.Crim.App.1983) (“To constitute adequate legal provocation, it must be *1166 of a nature calculated to influence the passions of the ordinary, reasonable man.”); James v. State, 24 So.3d 1157, 1163 (Ala.Crim.App.2009) (same); Knight v. State, 907 So.2d 470, 477 (Ala.Crim.App.2004) (same). Carroll’s “institutionalization” defense, however, sought to have the circuit court and the jury evaluate his perception of alleged provocation from the perspective of a prisoner housed in St. Clair prison as opposed to the prospective of an “ordinary, reasonable man.” Biggs, 441 So.2d at 992. Alabama law does not recognize evaluating whether provocation was sufficient to establish heat-of-passion manslaughter under a St. Clair prisoner standard. Rather, “[t]o constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary, reasonable man.” Biggs, 441 So.2d at 992. Consequently, evidence indicating that a prisoner may have perceived a provocation that a reasonable person would not is not relevant or admissible to reduce a criminal act committed in prison from capital murder to manslaughter.
Alternatively, assuming “institutionalization” may in some circumstances be a defense to capital murder, it was not under the circumstances of this case. Here, Carroll sought to admit Dr. Shaffer’s testimony to establish that, as a result of “institutionalization,” Carroll believed that failing to kill a person who stole his telephone would result in his becoming a victim, i.e., he would appear weak to other inmates and, thus, be victimized. Carroll’s belief, whether true or not, that he had to retaliate for the theft of a telephone to establish his strength in prison does not amount to legal provocation recognized by law. Spencer, 58 So.3d at 245. Stated differently, the law does not recognize killing someone to establish one’s place in the prison pecking order as adequate provocation to reduce capital murder to manslaughter.
Because, assuming Carroll’s facts as true, Dr. Shaffer’s testimony relating to “institutionalization” could not establish adequate provocation to reduce capital murder to heat-of-passion manslaughter, the circuit court properly excluded his testimony in the guilt phase as irrelevant. See Rule 401, Ala. R. Evid. (“‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”). Therefore, this issue does not entitle Carroll to any relief.
Within this argument, Carroll also asserts that the circuit court erred by refusing to allow Dr. Shaffer to testify to Carroll’s mental-health issues—“a compromised brain” and low intelligence—that he asserts would have supported a conviction for heat-of-passion manslaughter. According to Carroll, his mental-health issues, coupled with the prison environment, would have established that he killed Turner as a result of a perceived provocation reducing his crime from capital murder to manslaughter. His argument, however, is without merit.
As discussed above, the provocation Carroll perceived, for whatever reason, does not constitute legally recognized provocation; therefore, the circuit court did not err by excluding Dr. Shaffer’s testimony, See Spencer, 58 So.3d at 245. Further, Carroll’s alleged mental-health issues do not support his contention that he killed Turner as a result of legal provocation. Instead, Carroll’s alleged mental-health issues, at most, support a diminished-capacity defense. This Court has explained that “[t]he doctrine of diminished capacity provides that evidence of an abnormal mental condition not amounting to legal insanity but tending to prove that the *1167 defendant could not or did not entertain the specific intent or state of mind essential to the offense should be considered in determining whether the offense charged or one of a lesser degree was committed.” Williams v. State, 710 So.2d 1276, 1309 (Ala.Crim.App.1996) (citing 22 C.J.S., Criminal Law § 97 (1989)). The State of Alabama has expressly repudiated the diminished-capacity doctrine or defense. Williams, 710 So.2d at 1309. See also Jones v. State, 946 So.2d 903, 927 (Ala. Crim.App.2006); Sharifi v. State, 993 So.2d 907, 933 (Ala.Crim.App.2008).
Here, Carroll does not argue that Dr. Shaffer would have testified that his mental-health issues rose to the level of insanity under § 13A-3-1, Ala.Code 1975. Instead, he argues that Dr. Shaffer would have testified that his mental-health issues affected how he perceived the situation and, thus, supported a diminished-capacity defense. Because the State of Alabama has expressly repudiated the diminished-capacity doctrine, the circuit court did not err by excluding Dr. Shaffer’s testimony relating to Carroll’s alleged mental-health issues. Consequently, this issue does not entitle Carroll any relief.
VII.
Carroll next argues that the circuit court abused its discretion by refusing to instruct the jury on the lesser-included offense of heat-of-passion manslaughter. As in the preceding section of this opinion, Carroll relies on the prison environment, his mental-health issues, and his upbringing to argue that he perceived the taking of his telephone as a threat of harm. From there, Carroll argues that, because he perceived a threat of harm, the circuit court erroneously failed to charge the jury on heat-of-passion manslaughter as a lesser-included offense of capital murder. Relying on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), Carroll argues that the circuit court’s failure to instruct the jury on the lesser-included offense of manslaughter rendered his capital-murder convictions and sentences of death unconstitutional because it denied the jury the option of convicting him of a noncapital offense.
Rejecting a similar argument in Maples v. Allen, 586 F.3d 879, 893-94 (11th Cir.2009) (per curiam), rev’d on other grounds, Maples v. Thomas, 565 U.S. 266, 132 S.Ct. 912, 181 L.Ed.2d 807 (2012), the United States Court of Appeals for the Eleventh Circuit held:
“Maples relies primarily on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), but Beck is completely inapposite because it involved an all-or-nothing statute no longer extant. In the 1970s, Beck was convicted of capital murder. In Beck, the Supreme Court invalidated an Alabama statute that absolutely prohibited in capital cases the charging of all non-capital lesser included offenses. Athough the evidence warranted such an instruction in Beck’s case, the Alabama jury was given the choice only of (1) convicting Beck of the capital offense, for which the jury must impose the death penalty, or (2) setting him free. Beck, 447 U.S. at 628-30, 100 S.Ct. at 2385-86. The Supreme Court held Alabama’s all-or-nothing statute was unconstitutional because the absolute preclusion in a capital case of a lesser included offense, when the evidence supported it, violated procedural due process. See Beck, 447 U.S. at 627, 100 S.Ct. at 2384 (overturning death penalty where jury “was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict’); cf. Hopper v. Evans, 456 U.S. 605, 610-14, 102 S.Ct. 2049, 2052-54, 72 L.Ed.2d 367 (1982) (upholding *1168 death sentence even though jury was instructed on only capital offense under Alabama’s preclusion statute, because the evidence did not support a lesser included - offense charge and defendant was thus not prejudiced by preclusion statute).... [A] lesser included non-capital offense instruction is warranted[, however,] only when the evidence supports such an instruction.”
Similarly, this Court has held that “ ‘[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ Alabama Code 1975, § 13A-1-9(b) (emphasis added).” Bell v. State 518 So.2d 840, 842 (Ala.Crim.App.1987); see also Ex parte Myers, 699 So.2d 1285, 1291 (Ala.1997) (“A charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge.” (citations and internal quotations omitted)).
As discussed in the preceding section of this opinion, Carroll’s theory of provocation, which he alleged supported a heat-of-passion manslaughter instruction, does not, as a matter of law, constitute legally recognized provocation. See Spencer v. State, 58 So.3d 215, 245 (Ala.Crim.App.2008). Because the theory under which Carroll sought a manslaughter instruction failed to support such a charge as a matter of law, the circuit court did not abuse its discretion by refusing to instruct the jury on manslaughter. See Welch v. State, 630 So.2d 145, 146 (Ala.Crim.App.1993) (“ When the evidence clearly shows that the appellant is either guilty of the offense charged, or innocent, the charge on a lesser-included offense is not necessary or proper.’” (quoting Hollins v. State, 415 So.2d 1249, 1253 (Ala.Crim.App.1982))). Therefore, this issue does not entitle Carroll to any relief.
VIII.
Carroll next argues that the circuit court abused its' discretion by allowing the State to admit 17 photographs taken during Turner’s autopsy. According to Carroll, the State presented sufficient evidence to establish “Carroll’s involvement in Mr. Turner’s death”; therefore, the admission of the autopsy photographs “serve[d] no purpose as the issue was undisputed.” (Carroll’s brief, at 83.) Carroll asserts that the admission of the autopsy photographs “only served to unnecessarily arouse the passion and sympathy of the jury”; therefore, his conviction and sentence must be reversed. This Court disagrees.
This Court has repeatedly held:
“ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.’” Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986). ‘Photographic exhibits are admissible even, though they may be cumulative, demonstrative of undisputed facts, or gruesome.’ Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). *1169 ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[A]utopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.”’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002). ‘The same rule applies for videotapes as for photographs: “The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.” ’ Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, ‘[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence’ and ‘is admissible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.’ Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). ‘Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.’ Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).”
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
This Court has thoroughly reviewed all the photographs relating to the Turner’s murder that were admitted into evidence. The photographs were relevant and admissible to corroborate Dr. Ward’s testimony establishing the extent of Turner’s wounds and the cause of his death. The photographs are not unduly gruesome, and this Court concludes that them prejudicial effect did not outweigh their probative value. See Rule 403, Ala. R. Evid. Therefore, this Court holds that no error resulted from the admission of the autopsy photographs.
IX.
Carroll next argues that the circuit court erred in finding that the murder was especially heinous, atrocious, or cruel when compared to other capital murders. See 13A-5-49(8), Ala.Code 1975. First, he argues that there was no evidence indicating that Carroll inflicted violence beyond that necessary to cause death. Second, he argues that allowing the physical and mental suffering of a stabbing victim to satisfy this aggravating circumstance is unconstitutional because all murders involving a stabbing involve physical and mental suffering. This Court disagrees.
The circuit court found:
“The Court finds beyond a reasonable doubt the existence of aggravating circumstance (8) that the capital murder was especially heinous, atrocious or cruel as compared to other capital offenses. The evidence was clear that the victim was repeatedly stabbed about the head and body by the defendant causing substantial and needless physical and emotional suffering. This aggravating factor was proven by overwhelming evidence.”
(C. 162.)
The especially heinous, atrocious, or cruel aggravating circumstance “applies] to only those conscienceless or pitiless homicides which are unnecessarily *1170 torturous to the victim.” Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981) (citing State v. Dixon, 283 So.2d 1 (Fla.1973)), abrogated on other grounds by Ex parte Stephens, 982 So.2d 1148, 1152-53 (Ala.2006).
“ ‘There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim.’ ”
Saunders v. State, 10 So.3d 53, 108 (Ala.Crim.App.2007) (quoting Brooks v. State, 973 So.2d 380, 417-18 (Ala.Crim.App.2007), citing in turn Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999)).
Under the first two factors, “(1) the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and (2) the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted.” Norris, 793 So.2d at 854. Further, “[psychological torture [under the third factor] can be inflicted by leaving the victim in his last moments aware of, but helpless to prevent, impending death.” Norris, 793 So.2d at 859-60 (citations and quotation marks omitted). “[T]he factor of psychological torture must have been present for an appreciable lapse of time, sufficient enough to have caused prolonged or appreciable suffering, i.e., the period of suffering must be prolonged enough to separate the crime from ‘ordinary murders for which the death penalty is not appropriate.” Id. at 861 (holding that the murder of three individuals was not psychologically torturous because the three victims were shot in rapid succession; the “first three shots were sudden, without any warning or precipitating event[, and] [t]here was nothing preceding the first murder that would have evoked in the victims intense apprehension, fear, or anticipation of their deaths”).
The facts of Carroll’s crime establish all three factors indicating that the murder was especially heinous, atrocious, or cruel. Believing that Turner had stolen his cellular telephone, Carroll informed Turner that he was going to kill him. He then stabbed Turner in the back. Turner ran for his life and tried to take cover in a prison cell. While Turner was trying to close the cell door, Carroll pushed his way into the cell and stabbed Turner in the head. As Turner begged for his life, Carroll continued to stab him in the head, neck, and body. Turner, trying to stop the attack, informed Carroll that he did not take the telephone. Carroll briefly spoke with Turner, then began stabbing him again. After Carroll finished stabbing Turner, Turner walked out of the prison cell and said that he could not breathe. Turner then collapsed and was taken to the infirmary. When Turner got to the infirmary, he was covered in blood and saying that he could not breathe. Dr. Ward testified that the injuries Turner suffered would have been extremely painful and that, because Turner’s lung had been punctured, he would have been experiencing the feeling of suffocation.
From this evidence, the circuit court could have reasonably found that: (1) Carroll inflicted physical violence beyond that necessary or sufficient to cause Turner’s death; (2) Turner physically suffered for an appreciable lapse of time as a result of Carroll’s assault; and (3) Turner, knowing of his impending death, mentally suffered for an appreciable time. Consequently, the circuit court did not abuse its discretion by finding that Carroll’s capital of *1171 fense was especially heinous, atrocious, or cruel. See § 13A-5-49(8), Ala.Code 1975.
To the extent Carroll argues that § 13A-5-49(8) fails to comply with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), because it is impermis-sibly broad and fails to provide “a meaningful- basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not” (Carroll’s brief, at 86), his argument is without merit.
In Furman, a plurality of the Supreme Court of the United States struck down capital-sentencing schemes that gave unbridled discretion to the sentencer regarding whether to impose a sentence of death. As the United States Court of Appeals for the Eleventh Circuit has explained: “Fur-man requires only that sentencing discretion ‘be “directed and limited,” so that the death penalty [is] imposed in a more consistent and rational manner and so that there [is] a “meaningful basis for distinguishing the ... cases in which it is imposed from ... the many cases in which it is not.” ’ ” Moore v. Balkcom, 716 F.2d 1511, 1520 (11th Cir.1983) (quoting Lockett, v. Ohio, 438 U.S. 586, 601, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), quoting in turn Gregg v. Georgia, 428 U.S. 153, 188-89, 96 S.Ct. 2909, 49 L.Ed.2d 859, (1976)). In Godfrey v. Georgia, 446 U.S. at 428-29, the Supreme Court struck down a sentence of death where the aggravating circumstance relied upon to impose the sentence was so vague as to fail to channel the sentencer’s discretion. Thus, “[t]he Supreme Court’s post-Furman eases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a principled way to distinguish cases in which the death penalty is appropriate from cases in which it is not.” Ex parte Clark, 728 So.2d 1126, 1138 (Ala.1998).
“In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court’s application of the ‘especially heinous, atrocious or cruel’ aggravating circumstance because this Court’s application of it provided a ‘principled way to distinguish’ cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. 1759). The Eleventh Circuit emphasized that the Alabama appellate courts’ interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined ‘especially heinous, atrocious or cruel’ to include only ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added).”
Ex parte Clark, 728 So.2d at 1138 (footnote omitted).
Because § 13A-5-49(8), as construed, requires a finding that the capital murder was unnecessarily torturous and, thus, does provide “a principled way to distinguish cases in which the death penalty is appropriate from cases in which it is not,” Ex parte Clark, 728 So.2d at 1138, Carroll’s argument that it violates Furman and Godfrey is -without merit. Therefore, this issue does not entitle Carroll to any relief.
X.
Carroll next argues that the circuit court erroneously failed to find the *1172 existence of uncontroverted, statutory mitigating circumstances. Carroll first argues that the circuit court failed to find that the offense was committed while he was under influence of an extreme mental and/or emotional disturbance resulting from his background and from the prison environment in which he lived. § 13A-5-51(2), Ala.Code 1975. Carroll next argues that the circuit court erroneously found that he had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. § 13A-5-51(6), Ala.Code 1975. Carroll asserts that Dr. Shaffer’s testimony regarding his compromised brain, poor nutrition, and physical abuse demonstrated that he had impaired judgment; therefore, the circuit court should have found that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Finally, Carroll argues that the circuit court erroneously failed to consider his mental age as a mitigating factor. § 13A-5-51(7), Ala. Code 1975. Carroll did not raise these arguments in the circuit court; therefore, this Court reviews them for plain error only.
Section 13A-5-45(g), Ala.Code 1975, provides that, “[w]hen the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.” Further,
“[t]he United States Supreme Court’s decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), requires that a circuit court consider all evidence offered in mitigation when determining a capital defendant’s sentence. However,
“ ‘ “[M]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that [circumstance]. Mikenas [v. State, 407 So.2d 892, 893 (Fla.1981) ]; Smith [v. State, 407 So.2d 894 (Fla.1981) ].” Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).’
“Perkins v. State, 808 So.2d 1041 (Ala. Crim.App.1999). ‘ “Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance.” ’ Simmons v. State, 797 So.2d 1134, 1182 (Ala.Crim.App.1999), quoting Wilson v. State, 777 So.2d 856, 893 (Ala.Crim.App.1999). ‘ “While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’” Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989).”
Albarran v. State, 96 So.3d 131, 212-13 (Ala.Crim.App.2011). Thus, a circuit court is not required to find that a capital defendant’s evidence supports a mitigating circumstance; rather, “whether the evidence ... actually [supports a] mitigating [circumstance] is in the discretion of the sentencing authority.” Id.
Here, the circuit court considered the evidence presented by Carroll and found that it did not support the mitigating circumstances defined in §§ 13A-5-51(2), (6), or (7), Ala.Code 1975. The circuit court specifically considered Dr. Shaffer’s testimony regarding Carroll’s mental health, background, life experiences, and the pris *1173 on environment, but found that his testimony did not establish that Carroll was under influence of an extreme mental and/or emotional disturbance at the time of the offense or that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Further, the circuit court considered Carroll’s age—32—at the time of the offense and found that it was not a mitigating circumstance. The circuit court did, however, consider Carroll’s below-average intelligence and adaptive functioning, what Carroll describes as his mental age, his background, upbringing, and the prison environment as nonstatutory mitigating factors. Thus, the circuit court did consider all the evidence presented by Carroll; however, it found that that evidence failed to support the statutory mitigating circumstances outlined in §§ 13A-5-51(2), (6), or (7). Albarran, 96 So.3d at 213 (“[W]hether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.” (citations and quotations omitted)). This Court finds no error, much less plain error, in the circuit court’s consideration of Carroll’s mitigating evidence; therefore, this issue does not entitle Carroll to any relief. Rule 45A, Ala. R.App. P.
XI.
Carroll next argues that the State exercised its peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, Carroll argues that the State used 3 of its 21 peremptory challenges to remove 3 of 5 African-Americans from the jury. Carroll argues that the African-Americans struck by the State were as heterogeneous as the community as a whole and were treated disparately. He further argues that the State removed almost all African-Americans from the jury. Thus, he argues that the record establishes a prima facie case of racial discrimination and that the State’s reasons for striking one of the African-Americans were invalid. This Court disagrees.
At trial, the State used 3 of its 21 peremptory challenges to strike prospective jurors C.L., E.S., and O.T., who were African-American. At the conclusion of striking the jury, defense counsel stated that he was satisfied, and he did not raise a Bat-son objection. The following day, defense counsel raised an untimely Batson motion, arguing that the State had violated Batson when it struck C.L.—defense counsel did not object to the State’s use of its peremptory challenges to strike E.S. or O.T. Defense counsel argued that C.L. was African-American and there did not appear to be a reason to strike him. The State, without being ordered by the court, asserted that it struck C.L. and J.S., a Caucasian, because they had arrived late to the court. The State also asserted that it struck C.L. because he gave conflicting answers on his juror questionnaire and in court regarding his views on the death penalty. Defense counsel offered nothing to rebut the State’s reasons. The circuit court stated that it did not believe that Carroll had established a prima facie case of racial discrimination. It, then, assumed a prima facie case, found the State’s reasons to be race neutral, and overruled Carroll’s objection. Carroll raised an untimely Batson motion relating to C.L. and no Batson motion relating to E.S. or O.T.; therefore, this Court reviews this issue for plain error only. Rule 45A, Ala. R.App. P.
“To find plain error in the context of a Batson ... violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’ ” Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) *1174 (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987)). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App. 2007) (“For an appellate court to find plain error in the Batson ... context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges”). In evaluating a Batson claim, a three-step process must be followed. As the United States Supreme Court explained in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96—97[, 106 S.Ct. 1712, 1723 (1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id,, at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
537 U.S. at 328-29.
With respect to the first step of the process, “[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.” Ex parte Brooks, 696 So.2d 184, 190 (Ala.1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala.1987)). “A defendant makes out a prima facie case of discriminatory jury selection by ‘the totality of the relevant facts’ surrounding a prosecutor’s conduct during the defendant’s trial.” Lewis v. State, 24 So.3d 480, 489 (Ala.Crim.App.2006) (quoting Batson, 476 U.S. at 94, aff'd, 24 So.3d 540 (Ala.2009). “In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination.” Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of “relevant circumstances” to consider in determining whether a prima facie case of race discrimination has been established:
“The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic—their membership in the group— and that in all other respects they [were] as heterogeneous as the community as a whole.’ [People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson [v. Kentucky ], 476 U.S. [79] 97, 106 S.Ct. [1712] 1723 [ (1986) ].
“3. The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202 (1965) ].
“4. The type and manner of the state’s attorney’s questions and statements during vori dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; *1175 Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
“5, The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Sloppy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
“6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049 [(1976)].
“9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra,”
526 So.2d at 622-23.
Regarding the second and third step, this Court has explained:
‘““After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson [v. Kentucky ], 476 U.S. [79,] 97, 106 S.Ct. [1712,] 1723 [(1986)]. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986) ].”
“ ‘Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“ ‘ “Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’ Id. ‘[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly within the trial judges’s province.” ’ Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.”
“ ‘Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).’
“Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
*1176 ““‘When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.” Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). “A trial court is in a far better position than a reviewing court to rule on issues of credibility.” Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). “Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.” Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘ “Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will ‘largely turn on evaluation of credibility 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.”
“‘Hernandez v. New York, 500 U.S. 352, 365 (1991).’
“Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010).
“ ‘[WJhen more than one reason was given for striking some venire-members, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect. See Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App.1989).’
“Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). ‘ “So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.”’ Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
“ ‘Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.’ Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). ‘A determination regarding a moving party’s showing of intent to discriminate under Batson is “ ‘a pure issue of fact subject to review under a deferential standard.’” Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).’ Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’ Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).”
Thompson v. State, 153 So.3d 84, 123-24 (Ala.Crim.App.2012).
A.
Carroll first argues that the record establishes a prima facie case of racial discrimination in the State’s use of its peremptory challenges; therefore, the circuit court should have required the State to give race-neutral reasons for striking E.S. and O.T., in addition to C.L. According to Carroll, the State’s use of three of its peremptory challenges to remove three of five African-Americans indicates a discriminatory purpose. He further argues that E.S., O.T., and C.L. were as heteroge *1177 neous as the community as a whole and were treated disparately. This Court disagrees.
Initially, this Court notes that there is no indication that there was a pattern of strikes against African-Americans. The State questioned African-Americans and Caucasians similarly. The State engaged in meaningful voir dire with African-Americans and Caucasians alike. The State did not ask questions designed to elicit responses that would disqualify African-Americans but not Caucasians.
Further, contrary to Carroll’s assertion, the African-Americans struck were not as heterogeneous as the community as a whole and were not treated disparately. C.L. was struck because he arrived late to court. The State also struck J.S., a Caucasian, because he arrived late. O.T. indicated that she believed that the State’s burden of proof should be higher than beyond a reasonable doubt. The State also struck W.S., a Caucasian, who indicated that she believed that the State’s burden of proof should be higher than beyond a reasonable doubt. Further, the State initially challenged E.S. for cause because he had been convicted of unlawful distribution of a controlled substance, a felony conviction the State argued involved moral turpitude. See § 13A-12-211, Ala.Code 1975. The State ultimately withdrew its motion and chose to use a peremptory challenge to remove E.S.
Carroll argues that E.S. was not treated similarly to Caucasian potential jurors because the State did not strike A.J., a Caucasian who had been convicted of public intoxication. See 13A-11-10, Ala.Code 1975. Carroll’s argument is without merit. E.S. had been convicted of a felony. A.J., on the other hand, had been convicted of public intoxication, which is classified as a violation. See 13A-11-10, Ala.Code 1975.[5] “This Court has recognized that for disparate treatment to exist, the persons being compared must be ‘otherwise similarly situated.’ ” Sharp v. State, 151 So.3d 342, 367 (Ala.Crim.App.2010) (quoting Yancey v. State, 813 So.2d 1, 7 (Ala.Crim.App.2001)). It goes without saying that felonies and violations are not similar, and people convicted of felonies are not similarly situated with people who have been convicted of violations. Accordingly, E.S., who had been convicted of a felony and who had to petition to have his civil rights restored, was not treated disparately from A.J.
In sum, none of the Branch factors indicate racial discrimination in the State’s use of its peremptory challenges except, perhaps, the number of African-Americans struck, three out of five. Assuming, without deciding, that the number of strikes used against African-Americans does support Carroll’s argument, those numbers alone are insufficient to establish a prima facie case of racial discrimination. Ex parte Walker, 972 So.2d 737, 741 (Ala.2007) (explaining that an objection based on numbers alone is insufficient to establish a prima facie case of racial discrimination under Batson). Accordingly, the record in this case does not raise an inference that the State used its peremptory challenges in a racially discriminatory manner in violation of Batson. Therefore, the circuit court did not commit any error, much less plain error, in failing to require to State to give its reasons for striking E.S. and O.T. Consequently, this issue does not entitle Carroll any relief.
B.
Carroll next argues that the circuit court erroneously credited the State’s reasons for striking C.L. Because the *1178 State gave reasons for striking C.L., this Court will review those reasons despite the fact that Carroll failed to establish a prima facie case of racial discrimination under Batson, Clark v. State, 896 So.2d 584, 609 (Ala.Crim.App.2000).
As stated above, the State explained that it struck C.L. because he arrived late to court and because he gave conflicting answers on his juror questionnaire and during voir dire regarding his views on the death penalty. The State’s reasons were race neutral. See Jones v. State, 826 So.2d 901, 903 (Ala.Crim.App.2001) (reporting late for jury duty is a race-neutral reason for striking a juror); O’Neal v. State, 602 So.2d 462, 465 (Ala.Crim.App.1992) (same). Accordingly, the burden shifted to Carroll to show that the State’s reasons were merely a sham or pretext. See Welch v. State, 63 So.3d 1275, 1278 (Ala.Crim.App.2010) (recognizing that the State’s burden is to offer facially race-neutral reasons, after which the burden shifts to the defendant “to offer evidence showing that those reasons are merely a sham or pretext”). At trial, Carroll did not challenge the State’s reasons for striking C.L. Further, the record does not establish that the State’s reasons were a sham.[6] Accordingly, the circuit court did not commit any error, much less plain error, in finding that the State struck C.L. for race-neutral reasons. Therefore, this issue does not entitle Carroll to any relief.
XII.
Carroll next argues that the circuit court erred in relying on an inadequate and perfunctory presentence-investi-gation report in deciding whether to follow the jury’s recommendation and sentence Carroll to death. Specifically, Carroll argues that the presentence-investigation report failed to comply with § 13A-5-47(b), Ala.Code 1975, and Rule 26.3(b)(5) and (6), Ala. R.Crim. P., because it did not contain any information relating to his social or psychological background or information relating to his personal or social history. Carroll did not raise this issue in the circuit court; therefore, this Court’s review is limited to plain error. Rule 45A, Ala. R.App. P.
In Wilson v. State, 142 So.3d 732, 799-800 (Ala.Crim.App.2010), this Court addressed a similar challenge to the adequacy of a defendant’s presentence-investigation report, stating:
“In support of his argument, Wilson relies on Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), in which this Court reversed Guthrie’s sentence based on an insufficient presentence-investigation report. Specifically, this Court took issue with the lack of recent information in Guthrie’s personal- and social-history section of the report, and its lack of any information in Guthrie’s evaluation-of-offender section. In Guthrie, this Court held:
“ ‘This presentence report's cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court’s consideration *1179 of the full mosaic of Guthrie’s background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b)[, Ala.Code 1975]. We find that the insufficiency of this report requires a remand for the trial court to reconsider Guthrie’s sentence with a sufficient presentence report.’
“689 So.2d at 94[7].
“In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), this Court distinguished Guthrie, stating:
“ ‘In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie’s sentence and remanded the case for the trial court “to reconsider Guthrie’s sentence with a sufficient presentence report.” 689 So.2d at 947....
[[Image here]]
“ ‘ “... The purpose of the presen-tence investigation report is to aid the sentencing judge in determining whether the jury’s advisory verdict is proper and if not, what the appropriate sentence should be.” Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
“ ‘Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the “full mosaic of [Jackson’s] background and circumstances” before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie’s personal and social history contained in the report had been taken from an interview that was conducted at least five years before his sentencing hearing and no attempt had been made to update that information for purposes of the presen-tence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
“ ‘Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson’s trial, ... we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
“ ‘In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goffs and Dr. Smith’s psychological evaluations containing extensive information about Jackson’s life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not “hamstrung” into determining Jackson’s sentence without consideration of “the full mosaic” of Jackson’s background and cir *1180 cumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999). Therefore, we find no error, plain or otherwise, as to this claim.’
“791 So.2d at 1033-34. See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000).
“As in Jackson, the circuit court here was presented with ‘the full mosaic’ of Wilson’s background and circumstances. During the penalty phase, Wilson presented testimony from his mother, who testified at length about Wilson’s childhood, and from a childhood neighbor, who testified about Wilson’s willingness to aid her in her capacity as a disaster-relief worker. See Ex parte Washington, [106 So.3d 441, 450] (Ala.2011) (expressly refusing to hold that ‘the adequacy of the presentence report should be evaluated in isolation’). In addition, the reports that Wilson complains should have been part of the presen-tence-investigation report—the competency-exam report and the youthful-offender-investigation report—were, in fact, part of the circuit court’s file and are part of the record on appeal. (C. 29, 47-53; 1st Supp. C. 18-24.)
“Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presentence-investigation report, this Court holds that any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P.; Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding there was ‘no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information’). Accordingly, this issue does not entitle Wilson to any relief.”
Wilson, 142 So.3d at 799-800.
Similarly, the record indicates that the circuit court carefully considered “the full mosaic of [Carroll]’s background and circumstances before determining the proper sentence.” Guthrie v. State, 689 So.2d 935, 947 (Ala.Crim.App.1996). During the Atkins hearing and the penalty phase, Susan Wardell, a lawyer, mitigation specialist, and clinical social worker, testified at length regarding Carroll’s background, upbringing, social background. During those heaxñngs, Dr. Shaffer testified in detail regarding Carroll’s mental-health and psychological issues. Carroll presented evidence relating to the prison environment in which he had lived from a young age and the effect that environment would have had on his mental health. The circuit court also had records from Carroll’s education and records from the Alabama Department of Human Resources. The circuit court’s sentencing order establishes that it had before it a “full mosaic of [Carrolljs background and circumstances,” Guthrie, 689 So.2d at 947, and that it carefully considered those circumstances before sentencing Carroll to death.
Because Carroll presented extensive mitigation involving his social and psychological background, any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P. See Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding that there was “no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information”). Consequently, this issue does not entitle Carroll to any relief.
XIII.
Carroll next argues that the State of Alabama’s method of execution—lethal *1181 injection—constitutes cruel and unusual punishment in violation of the 8th and 14th Amendments to the United States Constitution. Specifically, he argues that Alabama’s “new procedures for lethal injection pose a substantial risk of inflicting unnecessary pain and therefore violate evolving standards of decency.” (Carroll’s brief, at 107-08.)
This Court notes that Carroll’s entire argument as to this issue consists of one paragraph and that it completely fails to offer any argument regarding why he believes lethal injection or Alabama’s procedure of implementing lethal injection is unconstitutional. Rather, Carroll, in cursory fashion, declares that Alabama’s lethal-injection procedure constitutes cruel and unusual punishment. Carroll’s argument fails to take into account the fact that he bears the burden to establish that the State’s method of execution constitutes cruel and unusual punishment. See Harris v. Wright, 93 F.3d 581, 583 (9th Cir.1996) (recognizing that the appellant bears a heavy burden to establish that his sentence is cruel and unusual); of. United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir.2006) (explaining that the appellant bears the burden to establish that his sentence in disproportionate); Cole v. State, 721 So.2d 255, 260 (Ala.Crim.App.1998) (recognizing that the appellant has the burden to establish that a state statute is unconstitutional); Holmes v. Concord Fire Dist., 625 So.2d 811, 812 (Ala.Civ.App.1993) (“The party mounting a constitutional challenge to a statute bears the burden of overcoming a presumption of constitutionality.”). Because Carroll bears the burden to establish that lethal injection is unconstitutional and because he has failed to argue why lethal injection is unconstitutional, his argument is without merit.
Moreover, this Court, in Saunders v. State, held that “lethal injection does not constitute per se cruel and unusual punishment. See e.g., McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein.” 10 So.3d 53, 111 (Ala.Crim.App.2007). Further, both the Supreme Court of the United States and the Alabama Supreme Court have held that lethal injection does not constitute cruel and unusual punishment. Glossip v. Gross, — U.S. -, -, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015) (holding that lethal injection does not violate the Eighth Amendment); Baze v. Rees, 553 U.S. 35, 54-56, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (holding that lethal injection does not violate the Eighth Amendment); Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008) (holding that lethal injection is not unconstitutional). Carroll has not offered this Court any basis upon which to hold that lethal injection is unconstitutional.
Because Carroll’s claim has been rejected by the Supreme Court of the United States, the Alabama Supreme Court, and this Court and because he has not offered this Court any reason to revisit that issue, he is not entitled to any relief.
XIV.
Carroll next argues that the circuit court erred by failing to inquire into possible juror misconduct. According to Carroll, the circuit court’s “failure to inquire into possible juror misconduct deprived Mr. Carroll of his rights to due process and a fair trial by inappropriately risking contamination of the jury pool after a biased veniremember provided details about the case to multiple other potential jurors during voir dire.” (Carroll’s brief, at 108.) Carroll did not raise this issue in the circuit court; therefore, this Court’s review is restricted to plain error. Rule 45A, Ala. R.App. P.
*1182 The jury venire was separated into panels for voir dire. During voir dire, the panels were asked whether anyone had read anything about this case, had heard anything about this ease, and/or had talked with anybody about this case. Those who responded in the affirmative were asked followup questions. (R. 438.) Thereafter, potential juror C.W. was questioned and the following occurred:
“THE COURT: We have [C.W.] here, and you said you knew some facts about the case; is that right?
“[C.W.]: Yes, sir.
“THE COURT: Can you elaborate about the facts that you know about the ease and give me a little idea about that?
“[C.W.]: Well, I don’t know. But I have worked at the St. Clair Correctional Facility for seven years.
“THE COURT: Okay.
“[C.W.]: I just recently left there.
“THE COURT: So you don’t work there anymore?
“[C.W.]: No, sir.
“THE COURT: Okay.
“[C.W.]: No, sir. I have—August the 3rd was my last day there of this year.
“THE COURT: And so you learned the facts; is that what you’re saying—
“[C.W.]: Yes, sir.
“THE COURT:—about this case?
“[C.W.]: Yes, sir.
“THE COURT: State, do you have any questions for her about what she learned?
“[State]: Yes. [C.W.], what facts are you alluding to that you know?
“[C.W.]: Just the case in general. I mean the stabbing, and I knew Michael Turner and worked on him and worked in his mouth. I worked on Taurus Carroll individually.
“[State]: Okay. You weren’t there that night?
“[C.W.]: No, sir.
“[State]: And you know about it from talking with other inmates—
“[C.W.]: Right. Or officers.
“[State]:—or other correctional officers there that night?
“[C.W.]: Yes, sir.
“[State]: Okay. All right.
“THE COURT: [Defense], do you have any more questions?
“[Defense]: Yes. Just based on information that you are aware of, the information that you received, would you be able to be fair and impartial to [Carroll]?
“[C.W.]: Yes, sir. To be fair, yes, sir.
“[Defense]: Have you discussed with any of the potential witnesses coming to testify here anything about this?
“[C.W.]: No, sir. It began when I took leave.
“[Defense]: Okay. Have you had discussions with any of the wardens about the case?
“[C.W.]: Recently?
“[Defense]: Since the event.
“[C.W.]: Not that I can recall.
“[Defense]: Whatever you heard, I presume it was from other inmates or—
“[C.W.]: Or staff.
“[Defense]: Information came to you as a result of you being a hygienist there?
“[C.W.]: And I worked there at the time of trauma. They went over the paperwork and anything.
“[Defense]: Would you be able to block all of that information out of your mind and consider the case solely on what you hear as evidence, as legal evidence during the trial?
“[C.W.]: It would be hard.
*1183 “[Defense]: It would be real hard, I would imagine. Would you be able to do it?
“[C.W.]: No, probably not.”
(R. 440-442.) C.W. was successfully challenged for cause.
Thereafter, the Court questioned prospective juror M.W. regarding what she had heard about the case. During the questioning, the following occurred:
“THE COURT: And we have [M.W.] Come around, [M.W.] You mentioned that you heard something about this case. Could you kind of elaborate on that?
“[M.W.]: It’s just like here when we first came today.
“THE COURT: Okay.
“[M.W.]: It was—it just came out from the lady. Some of it was that she had seen the accused at work and had heard about it.
“THE COURT: Okay.
“[M.W.]: I heard it from her.
“THE COURT: Anything else that you heard?
“[M.W.]: No, huh-uh.
“THE COURT: Okay. [D]o you have any follow-up on that?
[[Image here]]
“[Defense]: If you, would you be able to set aside what you believe or think you know now and listen to the evidence and follow the instructions of the Court and render a verdict based on what you hear here in the courtroom?
“[M.W.]: Yes, sir.
“[Defense]: Thank you.
“[Defense]: One more. Did you see [C.W,] ■ talking to anybody else about the case?
“[M.W.]: No. When we first came in, I sat beside her, and she had mentioned it. She said, ‘Oh, no. I know this person. I cleaned his teeth and know about the incident.’ And that’s all she said.
“[Defense]: Just between the two of /all?
“[M.W.]: Yeah.”
(R. 443-46.) The State used a peremptory challenge to strike M.W. from the jury. The court then questioned prospective juror C.S. regarding what she had heard about the case as follows:
“THE COURT: I just have some followup questions for you outside the presence of everyone else. You said you stated you had some knowledge of this case maybe?
“[C.S.]: Right.
“THE COURT: Can you elaborate on this?
“[C.S.]: Well, I just, in conversations with [C.W.] when—on Friday when you gave us our break, and—
“THE COURT: Okay. And that’s where you learned?
“[C.S.]:—she mentioned why.
“THE COURT: And what did she tell you?
“[C.S.]: Well, basically, she said she was familiar with this ease.
“THE COURT: Okay.
“[C.S.]: And that her husband worked at the correctional facility. And that the gentleman brought in was basically serving a life sentence without, you know, possibility of parole, and that he was accused of stabbing and killing another inmate.
“THE COURT: Okay. Anything else?
“[C.S.]: That was about it.”
(R. 449.) The State used a peremptory challenge to strike C.S. from the jury. Finally, the court questioned prospective juror R.S. regarding what she had heard *1184 about the case. During that questioning the following occurred:
“THE COURT: Come on up. I just wanted to follow up outside of everybody else’s presence what you may have heard about this case.
“[R.S.]: Sure. Obviously, all I heard, and this was on Friday, so it was just that—that he was convicted of murder of an inmate three years ago. And that’s all I heard.
[[Image here]]
“[Defense]: [R.S.], what you heard said, I believe you said Friday, would that in any way interfere with you giving both sides of this case a fair trial?
“[R.S.]: No, it would not.
“[Defense]: Could you be open minded and objective?
“[R.S.]: Yes.”
(R. 451-52.) The State used a peremptory challenge to strike R.S. from the jury.
Regarding the circuit court’s duty to investigate potential juror misconduct, this Court has explained:
“ ‘ “In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion ‘where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark.’ Bascom v. State, 344 So.2d 218, 222 (Ala.Cr. App.1977). However, the trial judge has a duty to conduct a ‘reasonable investigation of irregularities claimed to have been committed’ before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Crim.App.1984). His investigation should include a ‘painstaking and careful’ inquiry into the alleged juror misconduct. Lauderdale v. State, 22 Ala.App. 52, 54, 112 So. 92, 93 (1927).
[[Image here]]
“ ‘ “ ... [W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark by a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.
[[Image here]]
“ ‘Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987).’
“Riddle v. State, 661 So.2d 274, 276 (Ala.Cr.App.1994), quoting Holland v. State, 588 So.2d 543, 546, 548-49 (Ala.Cr.App.1991).
“ “What constitutes a “reasonable investigation of irregularities claimed to have been committed” will necessarily differ in each ease. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.
[[Image here]]
“ ‘ ... As long as the court makes an inquiry that is reasonable under the circumstances, an appellate court should not reverse simply because it might have conducted a different or a more extensive inquiry. Generally, where the judge polls the jury and each juror indicates that there has been no improper communication, that is sufficient. See Ham v. State, 540 So.2d 805, 810 (Ala.Crim.App.1988); Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). *1185 There is no absolute requirement that a juror alleged to have received an improper communication be examined apart from the other jurors. See Smith v. State, 432 So.2d 550 (Ala.Cr.App.1983), and Hopkins v. State, 429 So.2d 1146, 1162 (Ala.Cr.App.1983) (wherein the jury was questioned together as a group).’
“Sistrunk v. State, 596 So.2d 644, 648-49 (Ala.Crim.App.1992).”
Taylor v. State, 808 So.2d 1148, 1173-74 (Ala.Crim.App.2000).
Here, the circuit court questioned each panel of the venire regarding whether the members had heard or talked about the case. Each juror who answered in the affirmative was questioned separately. During the questioning, the circuit court determined that C.W. was familiar with the case and that she had disclosed that fact to three other prospective jurors. The circuit court then questioned the three other prospective jurors to discover what they had been told. The information provided by C.W. was, for the most part, innocuous—she was familiar with the case because she and her husband had both worked in the prison where the crime occurred. The circuit court also permitted the prosecution and the defense to question the prospective jurors. Two of the prospective jurors stated that they could set aside what they had heard and be fair to both sides. Further, none of the prospective jurors to whom C.W. spoke about the case served on Carroll’s jury.
Under these circumstances, the circuit court’s investigation into any misconduct by C.W. was reasonable. Consequently, no error, much less plain error, resulted from the manner in which the circuit court investigated C.W.’s statements, and this issue does not entitle Carroll any relief.
XV.
Carroll next argues that his right to be presumed innocent until proven guilty was violated when he was required to wear a prison uniform during trial. Specifically, he argues that requiring him to be on trial while wearing a prison uniform created a danger that the jurors would convict him simply because he is an inmate. Carroll did not object to being tried while wearing a prison uniform; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
As Carroll acknowledges in his brief, this Court has held that “requiring a defendant who is incarcerated to wear prison clothes [during trial] is not prejudicial where the fact of the case or the element of the crime would necessarily inform the jury that the defendant is an inmate.” (Carroll’s brief, at 113-14.) In George v. State, 423 So.2d 335 (Ala.Crim.App.1982), this Court explained:
“The appellant contends the trial court committed reversible error by failing to grant the appellant’s request to wear civilian clothing during the trial itself. We agree with the appellant that in the majority of cases, courts have held that a defendant should not be compelled to attend trial in prison clothing because it would tend to prejudice the jury against the defendant and, thereby, negate the presumption of innocence. Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). However, ‘[a] different result may be appropriate where the defendant is on trial for an offense allegedly committed while he was in prison, because the jury would learn of his incarceration in any event.’ Estelle v. Williams, supra.
“The appellant was on trial for an offense committed while he was an inmate at Holman prison. The jury was, therefore, certain to find out that he was *1186 in prison at the time he committed the robbery and during the course of the trial. ‘No prejudice can result from seeing that which is already known.’ United States ex rel. Stahl v. Henderson, 472 F.2d 556 (U.S.C.A., 5th Cir.1973), cert. denied, 411 U.S. 971, 93 S.Ct. 2166, 36 L.Ed.2d 694 (1973); Estelle v. Williams, supra.
“Therefore, we do not agree with the appellant’s contention and therefore hold that he was properly tried in his prison clothing.”
423 So.2d at 336-37. See also Jacques v. State, 409 So.2d 876, 880 (Ala.Crim.App.1981).
Here, Carroll was indicted for two counts of capital murder for killing another inmate at St. Clair Correctional Facility while Carroll was under a sentence of life imprisonment and after having committed another murder within the preceding 20 years. Thus, Carroll “was on trial for an offense committed while he was an inmate at [St. Clair] prison.” George, 423 So.2d at 336. “The jury was, therefore, certain to find out that [Carroll] was in prison at the time he committed the [murder] and during the course of the trial.” Id. Consequently, Carroll cannot show that error, much less plain error, resulted in him being tried while wearing his prison uniform. Rule 45A, Ala. R.App. P.
XVI.
Carrol finally argues that the cumulative effect of all the errors raised in his brief requires reversal of his convictions and sentences of death. Specifically, he contends that “[c]umulatively, the errors of state and federal law contained in this brief violated Mr. Carroll’s rights as guaranteed by the United States Constitution, Alabama Constitution and state law.” (Carroll’s brief, at 115.)
“As the Alabama Supreme Court has so succinctly stated, the cumulative-error rule is as follows: ‘[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.).”
Brownfield v. State, 44 So.3d 1, 33 (Ala.Crim.App.2007).
Applying the standard set forth in Ex parte Woods, 789 So.2d 941 (Ala.2001), this Court has reviewed the alleged errors Carroll has raised on appeal and has scrupulously searched the record for errors not raised on appeal. Rule 45A, Ala. R.App. P. After a thorough review of the record, this Court is convinced that no error, individually or cumulatively, entitles Carroll to relief.
XVII.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Carroll’s sentences of death. Carroll was convicted of two counts of capital murder—murder after having been convicted of another murder within the preceding 20 years, see § 13A-5-40(a)(13), Ala.Code 1975, and murder committed while Carroll was under a sentence of life imprisonment, see § 13A-5-40(a)(6), Ala. Code 1975. The jury unanimously recommended that Carroll be sentenced to death.
The record does not reflect that Carroll’s sentences of death were imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
*1187 The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the circuit court stated that it had found three aggravating circumstances: 1) that Carroll committed the capital offense while under a sentence of imprisonment, § 13A-5-49(1), Ala.Code 1975; 2) that Carroll committed the capital offense after having been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-6-49(2), Ala.Code 1975; and 3) that Carroll’s offense was especially heinous, atrocious, or cruel as compared to other capital offenses, § 13A-5-49(8), Ala. Code 1975. The circuit court then considered each of the statutory mitigating circumstances and found that none were applicable. The circuit court also considered evidence presented by Carroll and found the following nonstatutory mitigating circumstances: 1) that Carroll had a impoverished and abusive upbringing; 2) that his family received public assistance and lived in public housing; 3) that his mother abused alcohol; 4) that his father was absent; 5) that he had to be raised by a grandparent for part of his life; 6) that he suffered sexual abuse; 7) that he began abusing drugs at an early age; 8) that he lived in an overcrowded household; 9) that he suffered parental abuse and neglect; 10) that he has less than average intelligence and adaptive functioning; and 11) that Carroll had been incarcerated at a young age and lived in a prison environment. The circuit court also considered mercy as a nonstatutory mitigating circumstance. The sentencing order of the circuit court shows that it properly weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced Carroll to death. The record supports the findings of the circuit court.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstances and the mitigating circumstances to determine whether Carroll’s sentences of death are proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that Carroll’s sentences of death are appropriate.
As required by § 13A—5—53(b)(3), Ala.Code 1975, this Court must now determine whether Carroll’s sentences are excessive or disproportionate when compared to the penalty imposed in similar cases. In this case,' Carroll was convicted of 1 count of murder after having been convicted of another murder within the preceding 20 years, see § 13A-5-40(a)(13), Ala.Code 1975, and of 1 count of murder committed while Carroll was under a sentence of life imprisonment, see § 13A-5-40(a)(6), Ala.Code 1975. Further, the circuit court correctly found three aggravating circumstances: 1) that Carroll committed the capital offense while under a sentence of imprisonment, § 13A-5-49(1), Ala.Code 1975; 2) that Carroll committed the capital offense after having been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A—5—49(2), Ala.Code 1975; and 3) that Carroll’s offense was especially heinous, atrocious, or cruel as compared to other capital offenses, § 13A-5-49(8), Ala.Code 1975. Sentences of death have been imposed for similar crimes throughout the State. Peraita, v. State, 897 So.2d 1161, 1222 (Ala.Crim.App.2003); Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000); Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996). Therefore, this Court finds that Carroll’s sentences of death are neither excessive nor disproportionate.
Finally, this Court has searched the entire record for any error that may have adversely affected Carroll’s substantial *1188 rights and has found none. See Rule 45A, Ala. R.App. P.
Accordingly, Carroll’s capital-murder convictions and sentences of death are affirmed.
AFFIRMED.
WELCH, BURKE, and JOINER, JJ., concur. KELLUM, J., concurs in part and dissents in part, with opinion.

. Inmates are prohibited from having cellular telephones. Carroll possessed the cellular telephone in violation of the rules and regulations of the Alabama Department of Corrections.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The State did not object on the ground that Wardell was unqualified to render her opinion regarding Carroll’s adaptive functioning.

. This Court addresses Carroll's issues relating to the admission of his statement in a different order than Carroll addressed them in his brief.

. In Alabama, “[o]ffenses are designated as felonies, misdemeanors or violations." § 13A-5-3, Ala.Code 1975. Violations are the lowest offenses classified and carry a maximum punishment of 30 days in the county jail. § 13A-5-7(b), Ala.Code 1975.

. On appeal, Carroll argues that the record does not support the State's assertion that C.L. arrived late to court. He further argues that the inconsistency between C.L.’s answers regarding the death penalty on his juror questionnaire and during voir dire establish that C.L. was open-minded, a trait the State should want in a juror. Because this issue is being reviewed for plain error only, the record must establish that the State’s reasons were pretextual or a sham. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that to rise to the level of plain error, the error must be "obvious on the face of the record”). A record that neither supports nor rebuts the State's reasons cannot form the basis for this Court to find plain error. Id.